MICHAEL J. STORTZ (SBN 139386)
michael.stortz@dbr.com
MATTHEW J. ADLER (SBN 273147)
matthew.adler@dbr.com
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA  94105-2235
Telephone:     (415) 591-7500
Facsimile:      (415) 591-7510

SEAMUS C. DUFFY (*pro hac vice*)
seamus.duffy@dbr.com
MICHAEL W. MCTIGUE JR.*
michael.mctigue@dbr.com
MICHAEL P. DALY*
michael.daly@dbr.com
MEREDITH C. SLAWE*
meredith.slawe@dbr.com
DRINKER BIDDLE & REATH LLP
One Logan Square, Ste. 2000
Philadelphia, PA  19103-6996
Telephone:     (215) 988-2700
Facsimile:      (215) 988-2757

Attorneys for Defendants
COMCAST CORPORATION and
COMCAST CABLE
COMMUNICATIONS, LLC
* *pro hac vice* to be sought

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DAN ADKINS; JONATHAN BAILEY; REINIER BROKER; JAMES MCLAUGHLIN; NOLA PALMER; CHRISTOPHER ROBERTSON; DEREK VILLEGAS; and DALE WYNN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COMCAST CORPORATION; and COMCAST CABLE COMMUNICATIONS, LLC,<br><br>Defendants. | Case No. 3:16-cv-05969-VC<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date:  April 20, 2017<br>Time:  10:00 a.m.<br>Ctrm:  4<br>Judge:  Hon. Vince Chhabria |

# <u>TABLE OF CONTENTS</u>

I. INTRODUCTION ................................................................................................. 1

II. BACKGROUND ................................................................................................ 2

    A.    Retransmission Fees and Regional Sports Fees ..................................... 2

    B.    Comcast's Contractual Disclosures ........................................................ 3

    C.    Comcast's Extra-Contractual Disclosures .............................................. 4

          1.    Extra-Contractual Disclosures Referenced in the Complaint .... 4

          2.    Extra-Contractual Disclosures Omitted from the Complaint ...... 6

    D.    Plaintiffs' Pleadings ............................................................................... 7

III. STANDARDS OF REVIEW .......................................................................... 8

    A.    Federal Rule of Civil Procedure 12(b)(2) ............................................. 8

    B.    Federal Rule of Civil Procedure 12(b)(6) ............................................. 9

    C.    Federal Rule of Civil Procedure 9(b) .................................................. 10

    D.    Federal Rule of Civil Procedure 12(f) ................................................. 10

IV. DISCUSSION ................................................................................................ 10

    A.    This Court Lacks Personal Jurisdiction Over Comcast Corporation (All Counts) ........................................................................................... 10

    B.    Plaintiffs Have Not Stated A Claim For Breach Of Contract (Count 1) ............... 12

    C.    Plaintiffs Have Not Stated A Claim For Breach Of An Implied Duty (Count 2) ............................................................................................... 13

    D.    Plaintiffs Have Not Stated A Claim For Unjust Enrichment (Count 3) ............... 14

    E.    Plaintiffs Have Not Stated A Claim For Consumer Fraud (Counts 4 through 12) ............................................................................................ 15

          1.    Comcast's Disclosures Would Not Mislead a Reasonable Consumer, And Plaintiffs' Contrary Allegations Are Not Stated With Particularity ........................................................................ 15

          2.    Plaintiffs' Colorado Claim Cannot Be Pursued In A Class Action (Count 7) ................................................................... 20

          3.    Plaintiffs' Ohio Claim Cannot Be Pursued In A Class Action (Count 11) ................................................................... 21

    F.    Plaintiffs' Claims Are Barred By The Voluntary Payment Doctrine (All Counts) ........................................................................................... 21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

G.      Plaintiffs Have Not Stated A Claim For Equitable Relief (Counts 3 through 12) ................................................................................................................ 23

H.      Plaintiffs' Allegations Regarding Counsel and Non-Plaintiffs Should Be Stricken ............................................................................................................ 24

V. CONCLUSION ............................................................................................................ 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

CASES

4

*Abbott v. Amoco Oil Co.*,
    619 N.E.2d 789 (Ill. App. 1993) ...................................................................13, 14

5

6

*Am. Oil Serv. v. Hope Oil Co.*,
    15 Cal. Rptr. 209 (Cal. Ct. App. 1961) .......................................................22

7

8

*In re Annual Assessment of the Status of Competition in the Market for the
    Delivery of Video Programming, Seventeenth Report,*
    MB Docket No. 15-158................................................................................3

9

10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .....................................................................................9

11

*Badgett v. Sec. State Bank*,
    807 P.2d 356 (Wash. 1991)........................................................................13

12

13

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .....................................................................................9

14

15

*Berry v. Budget Rent A Car Sys., Inc.*,
    497 F. Supp. 2d 1361 (S.D. Fla. 2007) ......................................................18

16

*Boris v. Wal-Mart Stores, Inc.*,
    35 F. Supp. 3d 1163 (C.D. Cal. 2014) .......................................................16

17

18

*Boschetto v. Hansing*,
    539 F.3d 1011 (9th Cir. 2008)......................................................................9

19

20

*Bristol-Myers Squibb Co. v. Superior Court*,
    --- S. Ct. ---, 2017 WL 215687 (Jan. 19, 2017) .......................................12

21

*Burger King Corp. v. Weaver*,
    169 F.3d 1310 (11th Cir. 1999)...........................................................13, 14

22

23

*Carrero v. LVNV Funding, LLC*,
    No. 11-62439, 2014 WL 6433214 (S.D. Fla. Oct. 27, 2014)....................22

24

25

*Castagnola v. Hewlett-Packard Co.*,
    No. 11-5772, 2012 WL 2159385 (N.D. Cal. June 13, 2012)...............17, 19

26

*Chandler v. Wash. Toll Bridge Auth.*,
    137 P.2d 97 (Wash. 1943).........................................................................14

27

28

*Childs v. Microsoft Corp.*,
489 F. App'x 224 (9th Cir. 2012) ........................................................................13

*Cincinnati v. Cincinnati Gaslight & Coke Co.*,
41 N.E. 239 (Ohio 1895)........................................................................22

*Daimler AG v. Bauman*,
134 S. Ct. 746 (2014) ........................................................................10, 11

*Dandana, LLC v. MBC FZ-LLC*,
507 F. App'x 264 (3d Cir. 2012) ........................................................................14

*Davis v. HSBC Bank Nevada, N.A.*,
691 F.3d 1152 (9th Cir. 2012)........................................................................19

*Davis v. Powertel, Inc.*,
776 So. 2d 971 (Fla. 1st DCA 2000)........................................................................15

*Dorian v. Harich Tahoe Dev.*,
No. C-94-3387-DLJ, 1996 WL 925859 (N.D. Cal. Jan. 16, 1996)...........................................12

*Dudley v. MetroPCS Commc'ns, Inc.*,
No. 14-1802, 2014 WL 3908157 (N.D. Cal. Aug. 8, 2014) ........................................................................8

*Durell v. Sharp Healthcare*,
108 Cal. Rptr. 3d 682 (Cal. Ct. App. 2010) ........................................................................14

*Durkee v. Ford Motor Co.*,
No. 14-0617, 2014 WL 4352184 (N.D. Cal. Sept. 2, 2014) ........................................................................23

*Ebner v. Fresh, Inc.*,
838 F.3d 958 (9th Cir. 2016)........................................................................15

*Fantasy Inc. v. Fogerty*,
984 F.2d 1524 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994)...................10, 24

*Ferron v. Subscriber Base Holdings, Inc.*,
No. 08-0760, 2009 WL 650731 (S.D. Ohio Mar. 11, 2009)........................................................................18

*Ferron v. Zoomego, Inc.*,
No. 06-0751, 2007 WL 1974946 (S.D. Ohio July 3, 2007)........................................................................18

*In re Ford Motor Co. Speed Control Deactivation Switch Prods. Liab. Litig.*,
664 F. Supp. 2d 752 (E.D. Mich. 2009)........................................................................23

*Frainier v. Priceline.com*,
No. B225920, 2012 WL 592189 (Cal. Ct. App. Feb. 22, 2012) (unpublished)........................19

*Frederico v. Home Depot*,
507 F.3d 188 (3d Cir. 2007)........................................................................18

*Freeman v. Priceline.com*,
  No. B242653, 2013 WL 5946069 (Cal. Ct. App. Nov. 7, 2013) (unpublished) ...........17, 18, 20

*Freeman v. Time, Inc.*,
  68 F.3d 285 (9th Cir. 1995) ..................................................................................................15

*Friedman v. Dollar Thrifty Auto. Grp., Inc.*,
  No. 12-2432, 2015 WL 4036319 (D. Colo. July 1, 2015) ......................................................20

*Gardner v. Safeco Ins. Co. of Am.*,
  No. 14-2024, 2014 WL 2568895 (N.D. Cal. June 6, 2014) ....................................................23

*In re Gen. Motors Corp. & Hughes Elecs. Corp., Transferors & News Corp Ltd.,*
  *Transferee, for Authority to Transfer Control*,
  Mem. Op. & Order, 19 FCC Rcd. 473 (2004) .....................................................................3, 4

*Genova v. Banner Health*,
  734 F.3d 1095 (10th Cir. 2013) .......................................................................................13, 14

*Guz v. Bechtel Nat'l, Inc.*,
  8 P.3d 1089 (Cal. 2000) ........................................................................................................13

*Hansen v. Auto-Owners Ins. Co.*,
  No. 09-2736, 2010 WL 749820 (D. Colo. Mar. 4, 2010) ......................................................18

*Harmon v. Hilton Grp.*,
  No. 11-3677, 2011 WL 5914004 (N.D. Cal. Nov. 28, 2011) ...................................................9

*Harris v. Las Vegas Sands LLC*,
  No. 12-10858, 2013 WL 5291142 (C.D. Cal. Aug. 16, 2013) ...............................................19

*Horne v. Harley-Davidson, Inc.*,
  660 F. Supp. 2d 1152 (C.D. Cal. 2009) ................................................................................15

*Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*,
  170 P.3d 10 (Wash. 2007) (en banc) .....................................................................................22

*Janda v. T-Mobile USA, Inc.*,
  378 F. App'x 705 (9th Cir. 2010) ....................................................................................18, 19

*Johnson v. Microsoft Corp.*,
  802 N.E.2d 712 (Ohio Ct. App. 2003) ..................................................................................21

*Kearns v. Ford Motor Co.*,
  567 F.3d 1120 (9th Cir. 2009) .........................................................................................10, 18

*Kirkpatrick v. J.C. Bradford & Co.*,
  827 F.2d 718 (11th Cir. 1987) ................................................................................................8

*Knievel v. ESPN*,
    393 F.3d 1068 (9th Cir. 2005)........................................................................9

*Lazar v. Hertz Corp.*,
    82 Cal. Rptr. 2d 368 (Cal. Ct. App. 1999) ...................................................16

*Ljepava v. M.L.S.C. Props., Inc.*,
    632 F.2d 815 (9th Cir. 1980)........................................................................15

*Lowden v. T-Mobile USA, Inc.*,
    378 F. App'x 693 (9th Cir. 2010) .............................................................18, 19

*Lozano v. AT&T Wireless Servs., Inc.*,
    504 F.3d 718 (9th Cir. 2007)..........................................................................8

*Marder v. Lopez*,
    450 F.3d 445 (9th Cir. 2006)..........................................................................9

*Marrone v. Philip Morris USA, Inc.*,
    850 N.E.2d 31 (Ohio 2006)...........................................................................21

*Menken v. Emm*,
    503 F.3d 1050 (9th Cir. 2007)..................................................................11, 12

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ......................................................................................23

*In re N.J. State Bd. of Dentistry*,
    423 A.2d 640 (N.J. Super. 1980) ..................................................................22

*Noll v. eBay Inc.*,
    No. 11-4585, 2013 WL 2384250 (N.D. Cal. May 30, 2013).........................20

*Pablo v. ServiceMaster Glob. Holdings Inc.*,
    No. 08-03894, 2011 WL 3476473 (N.D. Cal. Aug. 9, 2011) .........................8

*Pattie v. Coach, Inc.*,
    29 F. Supp. 3d 1051 (N.D. Ohio 2014)..........................................................21

*People ex rel. Hartigan v. E&E Hauling, Inc.*,
    607 N.E.2d 165 (Ill. 1992) ............................................................................14

*Perret v. Wyndham Vacation Resorts, Inc.*,
    846 F. Supp. 2d 1327 (S.D. Fla. 2012) .........................................................18

*Philips v. Ford Motor Co.*,
    No. 14-2989, 2015 WL 4111448 (N.D. Cal. July 7, 2015)............................23

*Picot v. Weston*,
    780 F.3d 1206 (9th Cir. 2015)..................................................................11, 12

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*,
    631 F.3d 436 (7th Cir. 2011) ................................................................................18

*Plotkin v. Sajahtera, Inc.* (2003)
    131 Cal. Rptr. 2d 303 (Cal. Ct. App. 2003) ...................................................17, 19

*PNR, Inc. v. Beacon Prop. Mgmt., Inc.*,
    842 So. 2d 773 (Fla. 2003) ......................................................................................15

*In re Porsche Cars N. Am., Inc. Coolant Tubes Prods. Liab. Litig.*,
    880 F. Supp. 2d 801 (S.D. Ohio 2012) ..................................................................21

*Prilliman v. Canon City*,
    360 P.2d 812 (Colo. 1961) .......................................................................................22

*Princess Cruise Lines, Ltd. v. Superior Court*,
    101 Cal. Rptr. 3d 323 (Cal. Ct. App. 2009) ..........................................................16

*Prudential Home Mortg. Co. v. Superior Court*,
    78 Cal. Rptr. 2d 566 (Cal. Ct. App. 1998) ............................................................23

*Randazzo v. Harris Bank Palatine, N.A.*,
    262 F.3d 663 (7th Cir. 2001) ..................................................................................22

*Rhynes v. Stryker Corp.*,
    No. 10-5619, 2011 WL 2149095 (N.D. Cal. May 31, 2011) ...............................23

*Robins v. Glob. Fitness Holdings, LLC*,
    838 F. Supp. 2d 631 (N.D. Ohio 2012) ..................................................................21

*Rush v. Blackburn*,
    361 P.3d 217 (Wash. App. 2015) ...........................................................................15

*Ryan v. Wersi Elec. GmbH & Co.*,
    59 F.3d 52 (7th Cir. 1995) ......................................................................................15

*Scott v. Kuhlmann*,
    746 F.2d 1377 (9th Cir. 1984) ................................................................................22

*Simon v. United States*,
    756 F.2d 696 (9th Cir. 1985) ..................................................................................15

*Smale v. Cellco P'ship*,
    547 F. Supp. 2d 1181 (W.D. Wash. 2008) ......................................................18, 19

*Song v. Charter Comms., Inc.*,
    No. 37-2016-00039501-CU-BT-CTL (San Diego Super. Ct.) ..............................14

*Speyer v. Avis Rent a Car Sys., Inc.*,
    415 F. Supp. 2d 1090 (S.D. Cal. 2005), *aff'd*, 242 F. App'x 474 (9th Cir. 2007) ...................18

*Stanford v. Ronald H. Mayer Real Estate, Inc.*,
    849 P.2d 921 (Colo. App. 1993) ...................................................................14

*Steck v. N. Colo. Irrigation Co.*,
    35 P. 919 (Colo. Ct. App. 1894) ....................................................................22

*Stewart v. Screen Gems-EMI Music, Inc.*,
    81 F. Supp. 3d 938 (N.D. Cal. 2015) ...............................................................9

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007)............................................................................9

*Talalai v. Cooper Tire & Rubber Co.*,
    823 A.2d 888 (N.J. Law Div. 2001)................................................................15

*Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*,
    No. 13-1803, 2014 WL 1048710 (N.D. Cal. Mar. 14, 2014)...........................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..........................................................................................9

*Trujillo v. Apple Computer, Inc.*,
    581 F. Supp. 2d 935 (N.D. Ill. 2008) .............................................................15

*Two Moms & a Toy, LLC v. Int'l Playthings, LLC*,
    898 F. Supp. 2d 1213 (D. Colo. 2012) ...........................................................18

*United States v. Sierra Pac. Indus.*,
    759 F. Supp. 2d 1206 (E.D. Cal. 2010)......................................................24, 25

*Vernon v. Qwest Comm'ns Int'l, Inc.*,
    643 F. Supp. 2d 1256 (W.D. Wash. 2009).......................................................18

*Whittlestone, Inc. v. Handi-Craft Co.*,
    618 F.3d 970 (9th Cir. 2010)...........................................................................10

*Williams v. Bear Stearns & Co.*,
    725 So. 2d 397 (Fla. 5th DCA 1998) ..............................................................14

*Wilson v. Amerada Hess Corp.*,
    773 A.2d 1121 (N.J. 2001) ..............................................................................13

*Wuliger v. Mfrs. Life Ins. Co.*,
    567 F.3d 787 (6th Cir. 2009)...........................................................................14

*Zlotnick v. Premier Sales Grp., Inc.*,
    480 F.3d 1281 (11th Cir. 2007) ......................................................................15

**STATUTES, RULES & REGULATIONS**

47 U.S.C. § 325(b) ...............................................................................................2

47 U.S.C. § 532 ...................................................................................................16

47 U.S.C. § 542(c) ................................................................................................2

47 U.S.C. § 543(a)(1) ..........................................................................................16

47 U.S.C. § 552(d)(1) ..........................................................................................16

47 C.F.R. § 76.922(f)(3) ........................................................................................3

Cable Television Consumer Protection and Competition Act of 1992, Pub. L. 102-
    385, 106 Stat. 1460 (codified at 47 U.S.C. §§ 521-55) ..................................2

Cal. Civ. Proc. Code § 410.10 .............................................................................10

Cal. R. Prof. Conduct 2-100 ..........................................................................24, 25

Cal. R. Prof. Conduct 5-210 ...............................................................................24

Colo. Rev. Stat. § 6-1-113(2) ..............................................................................20

Fed. R. Civ. P. 8 ..................................................................................................10

Fed. R. Civ. P. 8(a)(2) ...........................................................................................9

Fed. R. Civ. P. 9 ............................................................................................10, 18

Fed. R. Civ. P. 9(b) ........................................................................................10, 18

Fed. R. Civ. P. 12(b)(2) .....................................................................................8, 9

Fed. R. Civ. P. 12(b)(6) .........................................................................................9

Fed. R. Civ. P. 12(d) ..............................................................................................9

Fed. R. Civ. P. 12(f) .......................................................................................10, 24

O.R.C. § 1345.09(B) ...........................................................................................21

**OTHER AUTHORITIES**

138 Cong. Rec. H11483 (daily ed. Oct. 5, 1992) ................................................2

138 Cong. Rec. S569 (daily ed. Jan. 29, 1992) ...................................................2

Charles W. Wolfram, *Modern Legal Ethics*, § 11.6.2 (1986) ..........................24

David Lieberman, *Comcast's 2014 Rates Will Include A $1.50 "Broadcast TV Fee"* (Nov. 22, 2013), *available at* http://deadline.com/2013/11/comcasts-2014-rates-will-include-a-1-50-broadcast-tv-fee-641966/..........................................................6

*In re Implementation of Section of the Cable Television Consumer Protection and Competition Act of 1992; Rate Regulation*, 8 FCC Rcd. 5631 (1993).......................................3

Restatement (First) of Restitution § 71 (1937) ........................................................22, 23

State Bar of California Standing Committee on Professional Responsibility and Conduct Formal Opinion No. 1993–131.............................................................25

1

## NOTICE OF MOTION TO DISMISS

2
TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3
      PLEASE TAKE NOTICE THAT on April 20, 2017 at 10:00 a.m., or as soon thereafter as

4
this matter may be heard before the Honorable Vince Chhabria in Courtroom 4 of the above-

5
entitled court, located at 450 Golden Gate Ave., 17th Floor, San Francisco, CA 94102,

6
Defendants Comcast Corporation and Comcast Cable Communications, LLC will and hereby do

7
move this court for an order dismissing Plaintiffs' Second Amended Complaint.

8
      This motion seeks dismissal of the Second Amended Complaint on grounds that this

9
Court lacks personal jurisdiction over Comcast Corporation and Comcast Cable Communications,

10
LLC, *see* Fed. R. Civ. P. 12(b)(2), that Plaintiffs have failed to state a claim on which relief can

11
be granted, *see* Fed. R. Civ. P. 12(b)(6), and that Plaintiffs have failed to state with particularity

12
their claims sounding in fraud, *see* Fed. R. Civ. P. 9(b).

13
      This motion is based upon this Notice, the accompanying Memorandum of Points and

14
Authorities, the Request for Judicial Notice and exhibits thereto, the Declaration of Claudia

15
Salcedo and exhibits thereto, and the Declaration of Derek Squire, as well as all papers and

16
pleadings on file or deemed to be on file herein, and such argument as may be presented at the

17
hearing.

18
Dated: February 21, 2017              DRINKER BIDDLE & REATH LLP

19

20
                                 By: /s/ Michael J. Stortz

21
                                    Michael J. Stortz
                                    Matthew J. Adler

22
                                    Attorneys for Defendants
                                    COMCAST CORPORATION and COMCAST

23
                                    CABLE COMMUNICATIONS, LLC

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

Plaintiffs allege that Comcast "invented" and then "inadequately disclosed" two fees: the Broadcast TV Fee that recovers a portion of the costs of retransmitting broadcast television signals, and the Regional Sports Fee that recovers a portion of the costs of distributing regional sports networks. To the contrary, itemizing such costs as separate charges on subscribers' bills was encouraged by Congress and expressly authorized by the FCC more than twenty years ago. When retransmission consent costs increased to the point that it became necessary for Comcast and other cable providers to do so, Comcast notified its subscribers and began disclosing the fees before, during, and after the ordering process. The disclosures include: notices in ads; hyperlinks, pop-ups, and check-boxes during the ordering process; order confirmation emails and videos that explain the fees; articles on the Comcast website that do likewise; rate cards sent to subscribers; itemized bills sent to subscribers (which the lead plaintiff **received and paid twenty-seven times** before filing this action); letters to local franchising authorities announcing the fees; and contracts, particularly the Term Agreement that discloses the fees by name, discloses that they are charged in addition to the base price, discloses that they may increase, and permits subscribers to terminate service without penalty within thirty days of subscribing to the services.

In short, no fees have been "hidden" and no "reasonable consumer" could credibly claim otherwise—which perhaps explains why counsel took more than two years to recruit his Plaintiffs, coached Plaintiffs to opt out of arbitration and voluntarily pay these fees rather than exercise their right to timely terminate service without making a payment or incurring a penalty, and alleged facts about pretextual conversations that he and his colleagues choreographed in order to elicit sound bites for their Complaint. Had Plaintiffs wanted to avoid paying the fees that were disclosed in their contracts, bills, and elsewhere, what they should have done was cancel service, which they could have done without making a payment or incurring a penalty. What they should **not** have done is voluntarily pay the fees in order to join a suit that counsel had been planning for more than two years. It follows that their claims lack merit and should be dismissed.

## II.

## BACKGROUND

### A.      Retransmission Fees and Regional Sports Fees

Plaintiffs would have the Court believe that Comcast "invented" the Broadcast TV Fee and Regional Sports Fee as part of a "shady" "scheme" to "hide" information from consumers. *See* Pls.' Sec. Am. Compl. ("SAC") ¶¶ 1, 27, 44.  On the contrary, the decision to break these fees out as a separate line-item on customers' bills is part of an attempt to educate consumers about the cause of bill increases, and are a direct result of the Cable Television Consumer Protection and Competition Act of 1992, Pub. L. 102-385, 106 Stat. 1460 (codified at 47 U.S.C. §§ 521-55).  That statute requires that multichannel video programming distributors ("MVPDs") have a broadcaster's "retransmission consent" in order to carry its signal.  *See* 47 U.S.C. § 325(b).  Congress recognized that broadcasters might charge cable companies for that consent, and that cable companies might pass those increased costs on to subscribers.[1]  Indeed, the original bill was amended before its passage in order to encourage MVPDs to itemize bills in several respects,[2] with a goal of "explain[ing] to people what is involved in the charges so they will know it is not just the cable company jacking up the prices."[3]  Insofar as retransmission consent is concerned, the FCC "recognize[d] that there will be costs associated with cable systems complying with their copyright and retransmission consent obligations," and held that such costs can be separately

---

[1]      *See* 138 Cong. Rec. H11483, 11484 (daily ed. Oct. 5, 1992) ("Cable companies will be forced . . . to pay huge sums to the networks which will become a legitimate expense, and then cable will pass it on to the customer.  The net effect of this legislation will be higher cable bills. Cable companies will become the collection agents for the networks.") (Statement of Rep. Rohrabacher).

[2]      47 U.S.C. § 542(c).

[3]      138 Cong. Rec. S569 (daily ed. Jan. 29, 1992) (Statement of Sen. Lott) ("I would like to offer my amendment . . . to give the cable companies an opportunity to itemize these so-called hidden costs to explain to people what is involved in the charges so they will know it is not just the cable company jacking up the prices.").  In other words, bill itemization was considered a consumer-friendly practice, not a "scheme."  *See id.* ("The fact is sometimes the rates have gone up because of hidden, unidentified increases in fees or taxes which the cable has to pay and the cable company passes on to the consumers, and it is not explained.  So I will have an amendment that will at least say the cable companies can identify on the bills those fees and taxes charged that drive up the rates.  At least let the people know.  Let us at least have openness in billing.").

1  itemized and "identified to subscribers if that is done in a manner that does not conflict with other

2  provisions of the law (e.g. prohibited by franchise agreement)."[4]

3       "[H]istorically," most broadcasters were content to receive "in-kind compensation from

4  cable operators in exchange for retransmission consent."[5]  In recent years, however, MVPDs have

5  been required to pay increasing amounts for retransmission consent, and, as Congress expected,

6  many of them have responded by passing that on to subscribers.  As the FCC recently reported,

7  these fees are now being charged by "many large MVPDs" as a way to "deal[] with higher

8  programming costs."[6]  As costs have increased and threatened interruptions have become more

9  common, retransmission consent has become a topic of broad public debate.[7]  As a result,

10  MVPDs have a legitimate—indeed, constitutionally protected—interest in educating subscribers

11  about the extent to which their bills are affected and separately charging for such costs.

12  **B.**    **<u>Comcast's Contractual Disclosures</u>**

13       The Comcast Agreement for Residential Services ("Subscriber Agreement") states that

14  customers agree to pay not only a base rate for service but also other additional "charges" and

15  "fees," including any additional "permitted fees and cost recovery charges."  SAC, Ex. A § 2(a).

16  It also notes that the pricing for subscribers with long-term promotional prices is "as specified in

17  the minimum term arrangement."  *Id.*  That Term Agreement is a two-page document that sets

18  forth the services to be provided, states the base price for the services, and provides a clear and

19  conspicuous statement about the challenged fees, including the facts that they are "extra" and that

20  they "are subject to change" during the term of the agreement:

21      [4]    *In re Implementation of Section of the Cable Television Consumer Protection and*

22  *Competition Act of 1992; Rate Regulation*, 8 FCC Rcd. 5631, 5967 ¶¶ 545-48 & n.1402 (1993); *see also* 47 C.F.R. § 76.922(f)(3) (listing "[r]etransmission consent fees" as an "external cost" that may be "passed-through" to subscribers).

23      [5]    *In re Gen. Motors Corp. & Hughes Elecs. Corp., Transferors & News Corp. Ltd.,*

24  *Transferee, for Authority to Transfer Control*, Mem. Op. & Order, 19 FCC Rcd. 473, ¶ 56 (2004).

25  [6]    *See In re Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming, Seventeenth Report*, MB Docket No. 15-158, ¶ 54 & n.143 (May 6, 2016); *id.* n.143 (identifying other MVPDs).

26  [7]    *See, e.g.*, <u>https://www.americantelevisionalliance.org/about-the-issue</u> ("Broadcasters are

27  abusing outdated rules to boost their bottom lines and continue to threaten viewers with blackouts. . . .  The ATVA's mission is a simple one: to give consumers a voice and ask

28  lawmakers to protect consumers by reforming outdated rules. . . .").

1
2
3
4

> You will receive the services under the Offer for the first [12 or 24 MONTHS] from the date the service is activated / installed, at the price specified above. ***Equipment, installation, taxes and fees, including Broadcast TV Fee (currently up to $5.00/mo.), Regional Sports Fee (currently up to $3.00/mo.) and [certain telephony charges] are extra***, such charges and fees are subject to change during and after the term of this Agreement.

5   *E.g.*, Defs.' Req. for Judicial Notice ("RJN") Ex. A ¶ 4 (emphasis added).[8]  The Term Agreement

6   also allows subscribers to cancel service without penalty within a given period of time.  *Id.* ¶ 2.

7   Indeed, all subscribers are given a thirty-day, money-back guarantee for any new service.[9]

8   **C.**    **Comcast's Extra-Contractual Disclosures**

9   Comcast discloses the challenged fees in multiple places across the various advertising,

10  sales, and communications channels it uses to reach prospective and current subscribers.

11  Examples include:  notices in advertisements; hyperlinks, pop-ups, and mandatory check-boxes

12  during the ordering process; order confirmation emails and videos that walk through fees and

13  charges; articles on the Comcast website that do likewise; letters to local franchising authorities;

14  rate cards sent to subscribers; and the bills themselves.  As the SAC makes plain, Plaintiffs were

15  exposed to many of these channels, including printed advertisements (Robertson, SAC figs. 1-2),

16  the online ordering process (Adkins, SAC ¶ 158), and in-person (McLaughlin, SAC ¶ 217),

17  telephonic (Bailey, SAC ¶¶ 192-93), and online chat conversations (Robertson, SAC ¶ 171).  Yet

18  the SAC paints only a fragmented and incomplete picture of each of these processes.

19         **1.**    **Extra-Contractual Disclosures Referenced in the Complaint**

20  Even the materials challenged in the SAC make specific reference to the Broadcast TV

21  Fee and Regional Sports Fee.[10]  For example, Figures 1 and 2 are a direct mail advertisement that

22  discloses that the fees exist and are "extra" and "subject to change."  *See* SAC fig. 2 ("Equipment,

23  _____

24  [8]    Although Plaintiffs chose not to attach the Term Agreement to the SAC, they refer to it, albeit by a different name, SAC ¶¶ 75-80; include images of the online order page, which shows that customers must check a box indicating their assent to the Term Agreement before proceeding,

25  *id.* fig. 7; and assert a claim for breach of contract.  *Id.* ¶¶ 276-82.  It follows that the Court may consider them without converting this Motion into a motion for summary judgment.  *See infra.*

26  [9]    *See*   https://customer.xfinity.com/help-and-support/account/comcast-customer-guarantee; https://experience.xfinity.com; *see also* Term Agreement ¶ 1.

27  [10]   Because the SAC contains images of these documents, the Court may consider them without converting this Motion into a motion for summary judgment.  *See infra.*
28

installation, taxes and fees, including regulatory recovery fees, **Broadcast TV fee (up to $3.50/mo.), Regional Sports Fee (up to $1.00/mo.) and other applicable charges extra**, and subject to change during and after the promo." (emphasis added)).

Likewise, Figures 3 through 9 are images of the ordering process. Figures 3 through 5 depict the screens certain customers see when choosing which services to order. They show that consumers who add services to their online shopping cart are shown a "Pricing & Other Info." link in a contrasting color directly under the "Add to Cart" button, and that the link opens a new window that provides a similar disclosure: "Equipment, installation, taxes and fees, including regulatory recovery fees, **Broadcast TV Fee (up to $3.50/mo.), Regional Sports Fee (up to $1/mo.)** and other applicable charges extra, and subject to change during and after the promo." *Id.* figs. 3, 4 (emphasis added); *see also id.* fig. 5 (allowing customers to specify number of televisions and types of channels, and also displaying "Pricing & Other Info." link).[11]

Similarly, Figures 6 and 7 are screenshots of an order submittal page. They show that, before a subscriber could press the "Submit Your Order" button, they were required to check a box indicating that "**I agree to the Comcast Agreement for Residential Services and the Pricing & Other Info.**" *Id.* fig. 6 (emphasis added); *id.* fig. 7 (another iteration of order submittal page, requiring user to check box stating, "**I have read and agree to the Comcast Agreement for Residential Services, and I have read and agree to the terms of the Minimum Term Agreement**" (emphasis added)).[12] And Figure 9 shows an order confirmation that includes a combined line item for estimated "Taxes, Surcharges and Fees," which is inclusive of the Broadcast TV and Regional Sports Fees, and which Plaintiffs do not and cannot attack as an inaccurate statement of the total fees and charges. *Compare id.* fig. 9, *with id.* figs. 13-14 (bill showing same amounts).

---

[11] The layout of the website has changed over time and by region; for example the current iteration of the webpage on which customers can review cable plans contains a contrasting-colored "Pricing & Other Info." link that includes a full disclosure of the fees, their amounts, and the fact that they may change "during and after the promo." Salcedo Decl., Ex. N.

[12] Another iteration of the order review page requires subscribers to click a box "agree[ing] to the following Terms & Conditions," including the "Pricing & Other Info." When clicked on, "Pricing & Other Info." reveals a disclosure which says, *inter alia*, "Broadcast TV Fee (up to $6.50/mo.), Regional Sports Fee (up to $4.50/mo.) and other applicable charges extra, and subject to change during and after the promo."). *See id.* Ex. O.

Finally, Figures 10 through 14 are images of various billing statements.  The customer bill included in the SAC likewise shows that the fees are broken out as line items.  *See* SAC fig. 10 (showing "BROADCAST TV FEE" as a separate line item).  The "long-form" (i.e., four-page) version of the customer bill contains a similar breakout of the fees in question.  Page two of that bill shows "Broadcast TV Fee" and "Regional Sports Fee" as separate line items.  *Id.* fig. 13.  And page three defines both of those fees:  "The Broadcast TV Fee recovers a portion of the costs of retransmitting television broadcast signals" and the "Regional Sports Fee recovers a portion of the costs to transmit certain regional sports networks."  *Id.* fig. 14.

## 2.    Extra-Contractual Disclosures Omitted from the Complaint

The SAC presents only a partial picture of Comcast's disclosures regarding these fees.[13]  For example, when Comcast ultimately chose to itemize these fees, it provided advance notice to its subscribers in their billing statements and to local franchising authorities in a dedicated letter.[14]  *See* Decl. of Claudia Salcedo ("Salcedo Decl."), Ex. I ("Effective 1/1/14, Comcast will implement a Broadcast TV Fee of $1.50 per month (excluding applicable taxes and fees) on video customers' bills to defray the rising costs of retransmitting broadcast television signals."); *id.* Ex. K (similar).  Comcast also discloses these fees in rate cards that are sent to subscribers upon activation and annually thereafter,[15] and maintains a "Help & Support" section of its website that provides additional information for customers curious about fees and charges, including "Understanding

---

[13]    Because the documents referenced in this section are not reproduced in, attached to, or referenced in the SAC, they are included here for completeness but are not relied upon below.

[14]    *See also* David Lieberman, *Comcast's 2014 Rates Will Include A $1.50 "Broadcast TV Fee"* (Nov. 22, 2013), *available at* http://deadline.com/2013/11/comcasts-2014-rates-will-include-a-1-50-broadcast-tv-fee-641966/ ("The cable giant will score some PR points next year when consumers open their monthly bills.  Instead of hiking rates for 'limited basic' and 'digital preferred' service, Comcast will tack on a new $1.50 charge that it calls a 'Broadcast TV Fee' — designed to point a finger at TV stations that demand rising retransmission consent payments. 'In recent years, the cost of retransmitting broadcast television signals has increased significantly, and we want to address these more recent increases through a separate itemized charge so that they are clear to you,' the company says in a customer notice.");  SAC ¶ 152 n.16.  Subscribers with a Term Agreement were not assessed these fees during the term of the agreement, *see* Salcedo Decl., Ex. J, and subscribers without a Term Agreement could have terminated service within thirty days, *see* SAC, Ex. A at 1 & § 4.

[15]    *See* Salcedo Decl. ¶ 7 & Exs. A-H (rate cards for Plaintiffs' markets).

Your Bill," which makes specific reference to Broadcast TV Fees,[16] and "Understanding the Taxes, Fees, Surcharges, and Other Charges On Your Bill," which lists and describes both fees.[17]

Insofar as the ordering process is concerned, subscribers receive order confirmations that have varied over time and by region. Although Plaintiff Palmer allegedly received an order confirmation that accounted for these and other fees under a non-itemized heading called "Taxes, Surcharges Fees," *see* SAC fig. 9, such order confirmations have varied in their structure and content over time and across regions. For example, a version of the confirmation that is currently in use states directly below the "Monthly Subtotal" that "this Monthly Subtotal does not include a Broadcast TV fee of up to $[] per month and a Regional Sports Fee of up to $[] per month," and has stated that "taxes and fees, including Broadcast TV Fee and Regional Sports Fee are extra, and subject to change."[18] Subscribers also receive an email with a link to a video that walks through their bill and its line items, including the Broadcast TV Fee and Regional Sports Fee.[19]

## D.    **Plaintiffs' Pleadings**

Although this action was not commenced until October 2016, it was conceived as early as ***June 2014***, at which time counsel started soliciting subscribers who could opt out of arbitration, and turned himself and his staff of "attorney investigators" into fact witnesses by engaging in pretextual conversations with Comcast's customer service representatives about the fees at issue. *See* SAC ¶¶ 63, 70-71, 147-48.[20]

---

[16]    *See* https://customer.xfinity.com/help-and-support/billing/understand-your-bill/ (stating in Section 9 that there will be "other fees" including "broadcast TV fees").

[17]    *See*    https://customer.xfinity.com/help-and-support/billing/most-common-taxes-fees-surcharges-on-your-bill ("**Broadcast TV Fee.** The Broadcast TV Fee is an itemized fee that recovers a portion of the costs of retransmitting broadcast television signals." (emphasis in original)); *id.* ("**Regional Sports Network Fee.** The Regional Sports Network Fee is an itemized fee that recovers a portion of the costs of distributing regional sports networks." (same)).

[18]    *See id.* Salcedo Decl. Ex. P.

[19]    *See id.* Ex. Q (screen shot of video). Notably, at least two of the Plaintiffs—specifically Plaintiffs Adkins and Broker—received this email. *Id.* ¶ 16.

[20]    *See* https://www.facebook.com/Hattis-Law-131073146913340/ (June 27, 2014) ("You must be a new customer so that you can opt out of Comcast's arbitration agreement and be a part of this action. . . . If you signed up for Comcast cable television service within the last 30 days, you may have a claim."); http://www.hattislaw.com/cases/lawsuit-against-comcast-for-charging-bogus-broadcast-tv-fee-and-regional-sports-fee/ ("if you previously opted out of Comcast's arbitration agreement, . . . you may qualify to participate as a plaintiff in this case."). Counsel is, it should be noted, right that subscribers must have "opt[ed] out of Comcast's arbitration

Counsel's guiding hand is also discernible in the alleged experiences of several Plaintiffs. Take, for example, the two California Plaintiffs. As for Mr. Robertson, his principal gripe is that his $61.94 bill is higher than the "approximately $60.00" he was told it would be. *Id.* ¶¶ 171-73. As for Mr. Adkins, as Table 1 below shows, he signed up for service on September 26, 2016, and then received his itemized bill ten days later, on October 6th. *Id.* ¶¶ 158, 160. Within one day he had already opted out of arbitration and mailed a letter to Comcast, *id.* ¶¶ 161-62, within two days counsel had mailed a letter of his own, *id.* ¶ 164, and within nine days he had filed a 76-page, 310-paragraph Complaint. *See* Dkt. No. 1. *All of this*, of course, occurred within the thirty days during which he could have terminated service without making a payment or incurring a penalty. In fact, *every Plaintiff* received their itemized bill within that thirty-day window and even so chose to voluntarily pay the fee rather than take advantage of the money-back guarantee:

| Table 1.  Chronology of Pre-Complaint Activities | | | | | | |
|---|---|---|---|---|---|---|
| **Plaintiff** | **Order Date** | **Install Date** | **First Bill Received** | **Opt-out Date** | **Demand Letter** | **SAC Citation** |
| **Adkins** | 9/26/16 | 10/1/16 | 10/6/16 | 10/7/16 | 10/8/16 | ¶¶ 158-61 & Fig. 8, Ex. F |
| **Robertson** | 11/9/15 | 11/11/15 | 11/14/15 | 12/2/16 | 12/24/15 | ¶¶ 171-72, 174, Ex. B |
| **Bailey** | 7/23/16 | 7/23/16 | 8/23/16 | 8/23/16 | 10/8/16 | ¶¶ 192-94, 201, Ex. F |
| **Broker** | 6/11/16 | 6/11/16 | 6/17/16 | 7/13/16 | 7/25/16 | ¶¶ 206, 208-09, 211, 214 |
| **McLaughlin** | 3/24/16 | N/A | 3/26/16 | 3/28/16 | 4/6/16 | ¶¶ 217, 220, 221-24 |
| **Palmer** | 3/4/16 | 3/10/16 | 3/10/16 | 3/16/16 | 4/6/16 | ¶¶ 228, 230, 232-33, 235-36 |
| **Villegas** | 2/11/16 | 2/12/16 | 2/21/16 | 3/2/16 | 4/6/16 | ¶¶ 240, 242-43, 246-47 |
| **Wynn** | 1/22/16 | 1/22/16 | 1/24/16 | 2/17/16 | 4/6/16 | ¶¶ 251, 253-55 |

### III.

### <u>STANDARDS OF REVIEW</u>

### A.    <u>Federal Rule of Civil Procedure 12(b)(2)</u>

Federal Rule of Civil Procedure 12(b)(2) authorizes courts to dismiss claims against defendants over which they lack personal jurisdiction. Plaintiffs bear the burden of establishing

---

agreement" to "be a part of this action." Because other subscribers agreed to pursue claims in individual arbitration, a putative class should not be defined in a way that includes them. *See, e.g.*, *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 728 (9th Cir. 2007); *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 725 n.5 (11th Cir. 1987); *Dudley v. MetroPCS Commc'ns, Inc.*, No. 14-1802, 2014 WL 3908157, at *2 (N.D. Cal. Aug. 8, 2014); *Pablo v. ServiceMaster Glob. Holdings Inc.*, No. 08-03894, 2011 WL 3476473, at *2 (N.D. Cal. Aug. 9, 2011). Should any claim survive dismissal, Comcast will move to limit the scope of the putative class accordingly.

1   that jurisdiction is proper, *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008), and cannot

2   discharge that burden with "legal conclusions unsupported by specific factual allegations."

3   *Swartz v. KPMG LLP*, 476 F.3d 756, 766 (9th Cir. 2007).   "When adjudicating a motion to

4   dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(2), a court may consider

5   extrinsic evidence—that is, materials outside of the pleadings, including affidavits submitted by

6   the parties." *Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 951 (N.D. Cal. 2015).

7   **B.      Federal Rule of Civil Procedure 12(b)(6)**

8            The Federal Rules of Civil Procedure require that pleadings "show[] that the pleader is

9   entitled to relief," and that courts dismiss any pleadings that "fail[] to state a claim upon which

10  relief can be granted." Fed. R. Civ. P. 8(a)(2), 12(b)(6).   In reviewing a motion to dismiss under

11  Rule 12(b)(6), courts must accept well-pleaded facts as true and view them in the light that is

12  most favorable to the plaintiff.   But it is not enough to offer a short and plain statement that

13  merely recites the elements of the claims for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009);

14  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).   Rather, the plaintiff must "provide the grounds

15  of his entitlement to relief," which "requires more than labels and conclusions" and "a formulaic

16  recitation of the elements of a cause of action." *Id.* at 555.   That means that the allegations "must

17  be enough to raise a right to relief above the speculative level." *Id.*   Put differently, they must

18  "nudge" claims "across the line from conceivable to plausible." *Id.* at 570.

19           In deciding a motion to dismiss, a court may look beyond the four corners of the pleading

20  without converting the motion into a summary judgment motion pursuant to Rule 12(d).   Thus,

21  courts can consider government documents, matters of public record, documents attached to the

22  complaint, and documents whose authenticity is not challenged and on which a claim is based.

23  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007); *Marder v. Lopez*,

24  450 F.3d 445, 448 (9th Cir. 2006); *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005);

25  *Harmon v. Hilton Grp.*, No. 11-3677, 2011 WL 5914004, at *9 (N.D. Cal. Nov. 28, 2011).

26  Otherwise, a plaintiff could survive a motion to dismiss simply by choosing not to attach a

27  dispositive document on which a claim is based.

28

**C.** **Federal Rule of Civil Procedure 9(b)**

Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard for claims sounding in fraud, requiring that plaintiffs "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Rule 9 "protect[s] those whose reputation would be harmed as a result of being subject to fraud charges" by requiring that allegations "be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (internal citations and quotations omitted). In other words, "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct." *Id.*

**D.** **Federal Rule of Civil Procedure 12(f)**

Federal Rule of Civil Procedure 12(f) permits courts to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Rule 12(f) is designed to prevent plaintiffs from driving up costs by requiring answers to unnecessary facts, and therefore gives courts the discretion to strike allegations that go beyond the "short and plain" statement that is required by Rule 8. *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010); *Fantasy Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994).

**IV.**

**DISCUSSION**

**A.** **This Court Lacks Personal Jurisdiction Over Comcast Corporation (All Counts)**

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 134 S. Ct. 746, 753 (2014). Under California law, courts may exercise personal jurisdiction "on any basis not inconsistent with the Constitution of this state or of the United States." Cal. Civ. Proc. Code § 410.10. The operative question, then, is whether Comcast Corporation has sufficient "minimum contacts" with California such that haling it into court in this state would be consistent with due process. *Daimler AG*, 134 S. Ct. at 754. Depending on the nature of the contacts, personal jurisdiction can be either "general" or "specific."

1    *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015).  Here, Plaintiffs did not and cannot meet

2    their burden of proving that there is either.

3         As for general jurisdiction, that arises only in a forum "in which [a] corporation is fairly

4    regarded as at home"—typically its place of incorporation and principal place of business.

5    *Daimler AG*, 134 S. Ct. at 760.  Here, Plaintiffs' jurisdictional allegations confirm that there is no

6    general jurisdiction over this Defendant in this State.  *See* SAC ¶ 20 (alleging that Comcast

7    Corporation is "headquartered in Philadelphia, Pennsylvania, and incorporated in Pennsylvania").

8    They offer no facts to support a conclusion that Comcast Corporation is "at home" in California,

9    or indeed anywhere else besides Pennsylvania.  It follows that there is no general jurisdiction here.

10        And as for specific jurisdiction, that arises only if: (1) the defendant has performed some

11   act or consummated some transaction within the forum or otherwise purposefully availed himself

12   of the privileges of conducting activities in the forum; (2) the claim arises out of or results from

13   the defendant's forum-related activities; and (3) the exercise of jurisdiction is reasonable.  *Picot*,

14   780 F.3d at 1211.  In determining whether a plaintiff's claim arises out of the defendant's forum-

15   related conduct, "the Ninth Circuit follows the 'but for' test.  Hence, [each plaintiff] must show

16   that he would not have suffered an injury 'but for' [the defendant's] forum-related conduct."

17   *Menken v. Emm*, 503 F.3d 1050, 1058 (9th Cir. 2007) (internal quotation omitted).

18        Here, both the Subscriber Agreement that forms the basis of Plaintiffs' claims and the

19   Form 10-K that Comcast Corporation filed in 2016 with the Securities and Exchange Commission

20   make it abundantly clear that operating subsidiaries—***not*** Comcast Corporation—provide "video,

21   high-speed Internet and voice services . . . to residential customers under the XFINITY brand."

22   Ex. G to RJN at 1; SAC, Ex. A at 1 (defining "Comcast" as "the operating company subsidiary of

23   Comcast Corporation that (i) owns and/or operates the cable television system in your area and/or

24   (ii) the subsidiary that is the XFINITY Digital Voice service provider or Unlimited Select and

25   Local Select service provider."); *see also* Declaration of Derek H. Squire (explaining different

26   structures and functions of Comcast Corporation and its operating subsidiaries).   In short,

27   Comcast Corporation had no contacts at all with the Plaintiffs, let alone contacts that would

28   warrant exercising personal jurisdiction over it.

1    Finally, personal jurisdiction does not exist as to the non-California Plaintiffs' claims

2    against *either* Defendant.  Even assuming the Court could exercise jurisdiction over both

3    Defendants by virtue of some specific contacts with the Plaintiffs who reside in California

4    (Adkins and Robertson), the Court obviously could not do so by virtue of any specific contacts

5    with those who reside elsewhere (Bailey, Broker, McLaughlin, Palmer, Villegas, and Wynn).

6    Simply put, Plaintiffs who received services in Colorado, Florida, Illinois, New Jersey, Ohio, and

7    Washington cannot credibly contend that their claims "arise[] out of or result[] [from] the

8    defendant's forum-related activities," *Picot*, 780 F.3d at 1211, in *any* sense, much less that they

9    would have suffered no injury at all "but for" any activities in California, *Menken*, 503 F.3d at

10   1058.  Because there must be jurisdiction "for each claim asserted," *Picot*, 780 F.3d at 1211, at a

11   minimum the claims of the non-California Plaintiffs must be dismissed as to both Defendants.[21]

12   **B.    Plaintiffs Have Not Stated A Claim For Breach Of Contract (Count 1)**

13         Plaintiffs' breach of contract claims should be dismissed for two fundamental reasons:

14   (1) Plaintiffs have not identified a contract between themselves and Comcast ***Corporation***; and (2)

15   Plaintiffs have not identified any provision of any contract that was breached by ***either*** Defendant.

16         First, Plaintiffs cannot state a breach of contract claim against Comcast Corporation

17   because they do not even allege the existence of a contract between themselves and that entity.

18   *See, e.g.*, *Dorian v. Harich Tahoe Dev.*, No. C-94-3387-DLJ, 1996 WL 925859, at *6 (N.D. Cal.

19   Jan. 16, 1996) ("Without alleging the actual existence of a contract between each defendant and

20   each plaintiff, plaintiffs have not properly pled a breach of contract claim.").  That is because no

21   such contract exists, *see* Exs. A-F to RJN at 2; SAC, Ex. A at 1, and the SAC pleads no facts

22   which would allow Plaintiffs to treat their contracts with Comcast Cable Communications, LLC

23   (or any operating subsidiary) as a contract with the parent company.[22]

24   _____

25   [21]    The Supreme Court recently decided to review whether a California court may assert
     specific personal jurisdiction over a non-resident defendant for claims by non-California residents

26   that did not arise out of, or relate to, conduct in California.  *See Bristol-Myers Squibb Co. v.
     Superior Court*, --- S. Ct. ---, 2017 WL 215687 (Jan. 19, 2017) (granting certiorari on 377 P.3d

27   874 (Cal. 2016)).

28   [22]    To be sure, Comcast Corporation can ***enforce*** certain parts of the Subscriber Agreement,
     including for example its arbitration provision, the scope of which extends to claims against

Second, nothing in the Subscriber Agreement or Term Agreement prohibits charging the Broadcast TV Fee and Regional Sports Fee. *See, e.g.*, *Childs v. Microsoft Corp.*, 489 F. App'x 224, 225 (9th Cir. 2012) ("Childs failed to state a claim for breach of the February 2009 employment contract because he did not cite a provision of that contract that Microsoft violated."). On the contrary, the Subscriber Agreement states that customers will pay not only a base rate for service but also other additional "charges" and "fees," including any additional "permitted fees and cost recovery charges," SAC, Ex. A § 2(a), and the Term Agreement identifies both the Broadcast TV Fee and Regional Sports Fee by name, explains that those fees "are extra" (i.e., above and beyond the base price), and notes that they are "subject to change during and after the term of this Agreement." Term Agreement ¶ 4. And as noted above, the FCC has held that retransmission consent costs may be passed through to subscribers, which brings them squarely within the meaning of "permitted fees and cost recovery charges." SAC, Ex. A § 2(a). In short, Plaintiffs do not and cannot identify any provision of any contract that was breached by anyone. It follows that this claim should be dismissed.

## C.   Plaintiffs Have Not Stated A Claim For Breach Of An Implied Duty (Count 2)

Plaintiffs' claim for breach of the implied duty of good faith and fair dealing should be dismissed because they would use that claim to rewrite their contracts. The duty of good faith and fair dealing requires only that a party with discretion under a contract must exercise that discretion reasonably rather than arbitrarily, capriciously, or in bad faith.[23] What it does ***not*** do is override the express terms of a contract or supply additional substantive obligations beyond those stated in the contract itself.[24]

---

parents, affiliates, etc. *See* SAC, Ex. A § 13(b). But that does not mean that it has a duty to ***perform*** under the Subscriber Agreement that theoretically could have been breached. It does not.

[23]   *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1130 (N.J. 2001); *Badgett v. Sec. State Bank*, 807 P.2d 356, 360 (Wash. 1991).

[24]   Plaintiffs acknowledge that the laws of their home states govern their individual claims. *See, e.g.*, SAC ¶ 275. However, the law in each state is in accord, at least on this issue. *E.g.*, *Genova v. Banner Health*, 734 F.3d 1095, 1103 (10th Cir. 2013) (applying Colorado law); *Abbott v. Amoco Oil Co.*, 619 N.E.2d 789, 795-96 (Ill. App. 1993); *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1316 (11th Cir. 1999) (applying Florida law); *Guz v. Bechtel Nat'l, Inc.*, 8 P.3d 1089, 1110 (Cal. 2000) ("The covenant thus cannot be endowed with an existence independent of its contractual underpinnings. It cannot impose substantive duties or limits . . . beyond those incorporated in the specific terms of their agreement." (internal quotation omitted)).

Yet that is precisely what Plaintiffs would do here. All of the conduct that is cited in support of this claim—requiring payment of charges above and beyond the base price of service, structuring those charges as discrete fees related to the carriage of broadcast channels and regional sports programming, and increasing the fees during subscribers' term contract periods— are expressly addressed and permitted by the parties' contracts. *See* SAC ¶¶ 287-89. Those alleged facts cannot support a cause of action for breach of this implied duty. *E.g.*, *Genova*, 734 F.3d at 1103 ("[I]t is long settled in Colorado, as it is in many jurisdictions, that the duty of good faith and fair dealing cannot be used to contradict terms or conditions for which a party has bargained." (internal quotation omitted)); *Burger King Corp.*, 169 F.3d at 1316. Moreover, Plaintiffs do not allege that the fees "placed [them] in financial trouble," "were out of line with those of other [cable] companies," or "that there could not have been legitimate business reasons for [Comcast's] actions." *Abbott*, 619 N.E.2d at 796. Absent such facts, this claim fails as a matter of law. *See id.* ("[T]he dealers cannot complain when Amoco merely exercises the discretion the dealers allowed Amoco to possess.").[25]

## D.  <u>Plaintiffs Have Not Stated A Claim For Unjust Enrichment (Count 3)</u>

Under the law of all of the states at issue here, a cause of action for unjust enrichment is not available when there is an enforceable contract governing the subject matter of the claim.[26] Here, Plaintiffs' unjust enrichment claims are merely a repackaging of their contract claims. *Compare* SAC ¶ 296 (unjust enrichment claim alleging that Comcast has been enriched by the "Broadcast TV Fees and Regional Sports Fees that Comcast charged [Plaintiffs], over and above what Comcast should have charged them"), *with id.* ¶ 280 (contract claim alleging that "Comcast has breached its contracts with Plaintiffs and Class members by charging more than it promised

---

[25]   Perhaps recognizing that this claim and the unjust enrichment claim lack merit, Plaintiffs' counsel omitted them from the similar suit filed against Charter and its subsidiary late last year. *See Song v. Charter Comms., Inc.*, No. 37-2016-00039501-CU-BT-CTL (San Diego Super. Ct.).

[26]   *Durell v. Sharp Healthcare*, 108 Cal. Rptr. 3d 682, 699 (Cal. Ct. App. 2010); *Stanford v. Ronald H. Mayer Real Estate, Inc.,* 849 P.2d 921, 923 (Colo. App. 1993); *Williams v. Bear Stearns & Co.*, 725 So. 2d 397, 400 (Fla. 5th DCA 1998); *People ex rel. Hartigan v. E&E Hauling, Inc.*, 607 N.E.2d 165, 177 (Ill. 1992); *Dandana, LLC v. MBC FZ-LLC*, 507 F. App'x 264, 270 (3d Cir. 2012) (New Jersey law); *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 799 (6th Cir. 2009) (Ohio law); *Chandler v. Wash. Toll Bridge Auth.*, 137 P.2d 97, 103 (Wash. 1943).

via an inadequately disclosed and invented Broadcast TV Fee and/or Regional Sports Fee").  As a result of that duplication, Plaintiffs' unjust enrichment claim fails as a matter of law.

Moreover, no Defendant was enriched by the payment of the fees, let alone unjustly so. First, there is no dispute that the base rates could have been set at a level sufficient to recover the costs now captured in the Broadcast TV and Regional Sports Fees.  Because Plaintiffs would have paid the same amount for their cable service even if the disputed fees were not itemized, they cannot even show ***enrichment*** stemming from the fees.  Second, Plaintiffs have failed to allege ***unjust*** enrichment, in that they received exactly what their bargain provided for (cable television service that included broadcast channels and regional sports), and they conferred the precise benefit required by that bargain (a base price, plus applicable fees and charges).  Their payment of the agreed-upon cost of their television service is not an unjust windfall.  *See, e.g.*, *Ljepava v. M.L.S.C. Props., Inc.*, 632 F.2d 815, 816 (9th Cir. 1980); *Horne v. Harley-Davidson, Inc.*, 660 F. Supp. 2d 1152, 1163 (C.D. Cal. 2009) ("Defendants were not unjustly enriched by collecting fees in accordance with a valid, enforceable contract."); *cf. Simon v. United States*, 756 F.2d 696, 699 (9th Cir. 1985) (finding that IRS was not unjustly enriched by the paying down of "a legitimate federal tax lien.").

**E.**     **Plaintiffs Have Not Stated A Claim For Consumer Fraud (Counts 4 through 12)**

**1.**     **Comcast's Disclosures Would Not Mislead a Reasonable Consumer, And Plaintiffs' Contrary Allegations Are Not Stated With Particularity**

Although the statutes invoked in Counts 4 through 12 vary widely in their substantive requirements for establishing liability,[27] they do all require that plaintiffs first plead and then prove that a reasonable consumer would be misled by a defendant's alleged misrepresentations.[28] Here, the SAC does not even satisfy that least common denominator.

---

[27]     *Compare, e.g.*, *Ryan v. Wersi Elec. GmbH & Co.*, 59 F.3d 52, 53 (7th Cir. 1995) (omitted facts must be material), *and Talalai v. Cooper Tire & Rubber Co.*, 823 A.2d 888, 897-98 (N.J. Law Div. 2001) (same), *with Davis v. Powertel, Inc.*, 776 So. 2d 971, 973 (Fla. 1st DCA 2000) (materiality not required).

[28]     *See, e.g.*, *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016); *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995) (UCL, CLRA, and FAL claims); *Rush v. Blackburn*, 361 P.3d 217, 225 (Wash. App. 2015); *Trujillo v. Apple Computer, Inc.*, 581 F. Supp. 2d 935 (N.D. Ill. 2008); *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007); *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003)).

As an initial matter, although Plaintiffs repeatedly allege that these fees have increased, they do not appear to argue that the existence or amount of these fees is in and of itself illegal. Nor could they, as any such arguments would be inconsistent with state law[29] and preempted by federal law.[30] That leaves Plaintiffs with the bare claim that the fees were inadequately disclosed. But that claim fails as a matter of law, as no reasonable consumer could proceed through the entire advertising, shopping, ordering, and billing process without realizing that these fees existed. On the contrary, the existence of these fees is facially apparent even from the disclosures that are incorporated into the SAC, such as:

> (1)   the Term Agreement (which referenced these fees by name and makes clear that they are "extra" and "subject to change");
>
> (2)   the Subscriber Agreement (which states that subscribers will be responsible for fees in addition to the base price);[31]
>
> (3)   the advertisement that was excerpted in the SAC (which disclosed that the total price would include a "Broadcast TV fee" and "Regional Sports Fee," which were "extra" and "subject to change during and after the promo");
>
> (4)   disclosures during the shopping and ordering process that could be accessed via hyperlinks that were (a) labeled "Pricing & Other Info.," (b) printed in contrasting-

---

[29]   *E.g.*, *Boris v. Wal-Mart Stores, Inc.*, 35 F. Supp. 3d 1163, 1171 (C.D. Cal. 2014) (rejecting UCL challenge to product price level because, "[a]bsent some legislative enactment, price setting is ordinarily left to the business judgment of merchants"); *Princess Cruise Lines, Ltd. v. Superior Court*, 101 Cal. Rptr. 3d 323, 331 (Cal. Ct. App. 2009) ("in the absence of legislatively crafted standards, it is not for us to lay down economic policy that passes on the reasonableness of charges"); *Lazar v. Hertz Corp.*, 82 Cal. Rptr. 2d 368, 377 (Cal. Ct. App. 1999) ("Thus, this case concerns a question of economic policy—that is, whether [a rental car] surcharge is too high and should be regulated. . . .   Judicial intervention in such economic issues is improper.").

[30]   *E.g.*, 47 U.S.C. § 543(a)(1) ("No . . . State may regulate the rates for the provision of cable service except to the extent provided under this section and section 532."); *id.* § 552(d)(1) (permitting states to enact and enforce consumer protection laws).

[31]   Indeed, there is something fundamentally implausible about the suggestion that Plaintiffs reviewed the Subscriber Agreement with sufficient care to appreciate both their right to opt out of arbitration and the process for doing so, while simultaneously failing to appreciate the contract's disclosure—on page 1—that there would be charged fees and charges on top of their base price. *Compare* SAC, Ex. A ¶ 2(a) ("Charges, Fees, and Taxes You Must Pay"), *with id.* ¶ 13 ("BINDING ARBITRATION").

colored type (specifically blue, which is the conventional color for hyperlinks), and (c) located directly beneath the button that a consumer would need to click in order to add cable service to the online shopping cart;[32]

(5)   a required checkbox that indicated a subscriber's agreement to be bound by similarly linked "Pricing & Other Info." terms;

(6)   post-order emails, including a confirmation email that accurately accounted for the monthly total of all add-on fees, surcharges, and taxes; and

(7)   subscribers' bills (which itemize and describe the fees).

*See supra* Sections II.B, II.C.

Plaintiffs appear to be operating on the assumption that, if a single web page, billing statement, or chat lacks a fulsome disclosure of the existence, amount, and nature of a given fee, then that is actionably deceptive.  But consumer protection laws do not exist to mandate perfect disclosures at every step of the customer experience.[33]  Instead, they ensure that, when viewed in context and as a whole, statements are not materially misleading to a reasonable consumer.

Plaintiffs ignore that fact, preferring for obvious reasons an artificially atomized analysis that omits the critical portions of some documents and disregards others entirely.  To be sure, the SAC is a lengthy pleading that makes many claims about advertising and billing practices.  But many of those averments are not tethered to the experience of ***any named Plaintiff***.  Instead, Plaintiffs provide a selective narrative that artfully avoids any averment about whether they read any of the disclosures described above.  Plaintiff Adkins, for example, references a single email. *See* SAC fig. 8 & ¶ 159.  But nowhere does he say whether he saw or clicked on the "Pricing &

---

[32]   Disclosures in hyperlinked materials are neither infrequent nor ineffective.  *See, e.g.*, *Castagnola v. Hewlett-Packard Co.*, No. 11-5772, 2012 WL 2159385, at *9-10 (N.D. Cal. June 13, 2012) (online offer that did not disclose service price on the face of the website was not deceptive under California law, because there were repeated references on the web site to the "offer details"—a link that a customer could click on and would there see the fees); *Freeman v. Priceline.com*, No. B242653, 2013 WL 5946069, at *7 (Cal. Ct. App. Nov. 7, 2013) (unpublished) ("Appellant next contends he raised a triable issue of fact as to whether the disclosures on Priceline's Web site were misleading because many of them were contained within hyperlinks. To the contrary, hyperlinks have been held to convey adequate and unambiguous notice in a variety of situations." (collecting authorities)).

[33]   *See, e.g.*, *Plotkin v. Sajahtera, Inc.* (2003) 131 Cal. Rptr. 2d 303, 312 (Cal. Ct. App. 2003) ("there is no requirement [in the UCL] that reasonable notice has to be the best possible notice").

1    Other Info." links that he encountered during the ordering process or whether he did, in fact,

2    check the required boxes to evidence his agreement to the rate structure that he now challenges.

3    Nor, for that matter, does he disclose that he had—until approximately a month before filing his

4    Complaint—been a Comcast video customer at a different address and, while there, had paid the

5    Broadcast TV Fee more than 25 times, and the Regional Sports fee more than a dozen times.[34]

6    Similarly, despite pointing out that consumers in different regions have encountered different

7    webpage layouts and bill formats at different points in time over the past 18 months, *see* SAC

8    ¶¶ 158, 95 & figs. 6-7 & 10-11, neither Mr. Adkins nor any other Plaintiffs specifies which form

9    of disclosures they received.  That falls far short of the particularity that is required by Rule 9.[35]

10   Plaintiffs also appear to believe that it is categorically unfair or deceptive to advertise a

11   base price and then charge any fees in addition to that base price.  But the law is emphatically to

12   the contrary, as court after court has held that such billing practices are wholly unobjectionable so

13   long as the fees in question are adequately disclosed to consumers.[36]

---

14   [34]   *See* Salcedo Decl., ¶ 12 & Ex. M.  It is worth noting that, to the extent Mr. Adkins seeks
15   to recover the Broadcast TV and Regional Sports Fees that he paid for years in connection with a
     different account, any claim for damages sustained before October 15, 2015 would be barred by
16   the one-year limitations period contained in the Subscriber Agreement.

17   [35]   *Kearns*, 567 F.3d at 1125 (Rule 9(b) applies to UCL and CLRA claims sounding in fraud);
     *Two Moms & a Toy, LLC v. Int'l Playthings, LLC*, 898 F. Supp. 2d 1213, 1219 (D. Colo. 2012);
18   *Hansen v. Auto-Owners Ins. Co.*, No. 09-2736, 2010 WL 749820, at *2 (D. Colo. Mar. 4, 2010)
     (collecting authorities); *Perret v. Wyndham Vacation Resorts, Inc.*, 846 F. Supp. 2d 1327, 1333
19   (S.D. Fla. 2012) (although not all FDUTPA claims sound in fraud, Rule 9(b) applies to those that
     do); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436 (7th
20   Cir. 2011); *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (applying Rule 9(b) to
     claims arising under the NJCFA); *Ferron v. Subscriber Base Holdings, Inc.*, No. 08-0760, 2009
21   WL 650731, *5 n.4, (S.D. Ohio Mar. 11, 2009) (citing *Ferron v. Zoomego, Inc.*, No. 06-0751,
     2007 WL 1974946 (S.D. Ohio July 3, 2007)); *Vernon v. Qwest Comm'ns Int'l, Inc.*, 643 F. Supp.
     2d 1256, 1264 (W.D. Wash. 2009).

22   [36]   *See, e.g., Janda v. T-Mobile USA, Inc.*, 378 F. App'x 705, 707 (9th Cir. 2010) (finding no
     CLRA, UCL or FAL violation by charging fees that were not included in advertised prices
23   because fees were disclosed in terms and conditions); *Lowden v. T-Mobile USA, Inc.*, 378 F.
     App'x 693, 695 (9th Cir. 2010) (affirming dismissal of non-disclosure claims because the
24   defendant's contract "adequately disclosed that it would pass along regulatory fees . . . to its
     customers"); *see also Smale v. Cellco P'ship*, 547 F. Supp. 2d 1181, 1189 (W.D. Wash. 2008)
25   (finding no consumer fraud claim for failing to disclose fees above the advertised price because
     fees were disclosed in contract); *Speyer v. Avis Rent a Car Sys., Inc.*, 415 F. Supp. 2d 1090, 1100
26   (S.D. Cal. 2005) (rejecting UCL challenge to cost recovery fee not reflected in base rate for rental
     cars), *aff'd*, 242 F. App'x 474 (9th Cir. 2007); *Berry v.  Budget Rent A Car Sys., Inc.*, 497 F. Supp.
27   2d 1361, 1367 (S.D. Fla. 2007) ("the simple fact of the [cost recovery fee], and its itemization as
     a separate charge, is not unfair or deceptive because it was clearly disclosed at the time of the
28   rental"); *Freeman*, 2013 WL 5946069, at *7 (rejecting a claim that television ads were deceptive

Indeed, the cascade of disclosures in this case is more robust than the modest disclosures in other cases in which similar claims were rejected.  For example, in *Janda*, the Ninth Circuit held that T-Mobile had not violated the UCL, FAL, and CLRA by charging fees that were not included in its advertised price.  *See* 378 F. App'x at 707.  The court so held because one plaintiff's "Service Agreement and T&Cs explicitly disclosed the [challenged fees], and [the other plaintiff's] Service Agreement and T&Cs disclosed that 'Any applicable . . . regulatory costs . . . imposed on . . . Us [T-Mobile] as a result of providing the Service . . . will be added to your charges as permitted . . . by law." *Id.* (alterations in original); *see also Lowden*, 378 F. App'x at 695 (Washington-law claims dismissed because T-Mobile's standard contract "adequately disclosed that [T-Mobile] would pass along regulatory fees . . . to its customers"); *Smale*, 547 F. Supp. 2d at 1189 (similar).

In a similar mold is *Harris*.  There, the Central District held that a hotel's omission of a resort fee from the "Grand Total" price displayed on its website was not misleading, where the "Grand Total" price was caveated with an asterisk and the disclosure was provided multiple times, including "on a separately hyperlinked page of Terms and Conditions and . . . in Plaintiff's email." 2013 WL 5291142, at *5; *see also Frainier*, 2012 WL 592189, at *4 (exclusion of certain mandatory fees from website's "total charges" price was not deceptive because their mandatory nature and non-inclusion in the "total charges" price was disclosed in a "readable" paragraph on the "contract" page of defendant's website).[37]   Claims arising from allegedly misleading

---

for failing to include disclosures of additional fees beyond advertised price because the ads "in no way enable a customer to bypass or otherwise avoid the multiple disclosures on Priceline's Web site"); *Harris v. Las Vegas Sands LLC*, No. 12-10858, 2013 WL 5291142, at *5 (C.D. Cal. Aug. 16, 2013) (omitting a resort fee from a "Grand Total" price on the hotel's website was not misleading, where asterisk operated as caveat to the "Grand Total" price, the disclosure regarding the additional fee was directly below the Grand Total, and was only slightly smaller in size than the rest of the text (7-point font vs. 8.5)); *Frainier v. Priceline.com*, No. B225920, 2012 WL 592189, at *4 (Cal. Ct. App. Feb. 22, 2012) (unpublished) (similar).

[37]     The contrast to other cases is even starker.  *See, e.g.*, *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1162 (9th Cir. 2012) (failure to disclose that credit card had an annual fee held not to violate the False Advertising Law because consumers were well aware that there would be "numerous other costs of owning a credit card" and that the addition of an annual fee would not so change the calculus for a reasonable consumer as to be deceptive or misleading); *Plotkin*, 131 Cal. Rptr. 2d at 311 (not a deceptive practice for hotel not to disclose, except on valet claim tickets, that utilizing valet parking would incur charges); *Castagnola*, 2012 WL 2159385, at *9-10 (online offer was not deceptive, despite not disclosing the price of the service on the face of

---

DEFENDANTS' MOTION TO DISMISS                    -19-                    CASE NO. 3:16-cv-05969-VC

1   advertising have also been rejected when consumers could not "bypass or otherwise avoid the

2   multiple disclosures on [defendant's] Web site." *Freeman*, 2013 WL 5946069, at *7.  So too here,

3   where someone trying to order cable service online would be forced to check a box indicating his

4   agreement with the very pricing terms and rate structures that Plaintiffs decry as "hidden" and

5   "undisclosed."  SAC ¶¶ 7, 58.

6       Perhaps it is because of the strength of this case law that Plaintiffs focus so much of their

7   attention on alleged mistakes made by human beings during oral or online-chat conversations.

8   But even if we accept those allegations as true for present purposes, the fact remains that no part

9   of the ordering process set forth above could deceive a reasonable person into thinking that there

10  would be no fees or charges above the base rate for the service.  Plaintiffs' consumer fraud claims

11  therefore fail as a matter of law.

12      **2.      Plaintiffs' Colorado Claim Cannot Be Pursued In A Class Action (Count 7)**

13      Although Colorado's Consumer Protection Act authorizes enforcement by private citizens,

14  it does not allow such enforcement via class actions for damages.  *See* Colo. Rev. Stat. § 6-1-

15  113(2) ("***Except in a class action*** or a case brought for a violation of section 6-1-709, any person

16  who, in a private civil action, is found to have engaged in or caused another to engage in any

17  deceptive trade practice listed in this article shall be liable in an amount equal to [the sum of

18  certain types of recovery].").  As the text of the statute makes plain, if a defendant is sued "in a

19  private civil action" that is "a class action," that defendant cannot "be liable" under the statute.

20  *See id.*; *Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.,* No. 13-1803, 2014 WL 1048710, at

21  *10 (N.D. Cal. Mar. 14, 2014) (Chen, J.) (dismissing CCPA claim "to the extent it seeks to assert

22  a class action"); *see also Friedman v. Dollar Thrifty Auto. Grp., Inc.*, No. 12-2432, 2015 WL

23  4036319 (D. Colo. July 1, 2015) (granting judgment on the pleadings with respect to class

24  _____

25  the website, because there were repeated references on the web site to the "offer details"—a link
    that a customer could click on and would there see the fees); *Noll v. eBay Inc.*, No. 11-4585, 2013

26  WL 2384250, at *5 (N.D. Cal. May 30, 2013) (eBay's failure to note in the body of its fee
    schedule that certain fees would recur on a monthly basis held not deceptive because "[t]he

27  disclosure appears at the end of the Fee Schedules in a section entitled 'The fine print[,]' . . .
    [which] follows the fee tables, appears in the same font as the rest of the fee schedule, bears a

28  bolded title, and is relatively short").

1    allegations and denying as to individual plaintiffs' allegations).  This claim should therefore be

2    dismissed insofar as it seeks to assert claims on behalf of a Colorado subclass.

3           **3.      Plaintiffs' Ohio Claim Cannot Be Pursued In A Class Action (Count 11)**

4           To pursue a class action under the Ohio Consumer Sales Practices Act, "plaintiff[s] must

5    allege that defendant had prior notice that its conduct was 'deceptive or unconscionable.'" *Pattie*

6    *v. Coach, Inc.*, 29 F. Supp. 3d 1051, 1055 (N.D. Ohio 2014) (quoting O.R.C. § 1345.09(B));

7    *Robins v. Glob. Fitness Holdings, LLC*, 838 F. Supp. 2d 631, 648 (N.D. Ohio 2012); *Johnson v.*

8    *Microsoft Corp.*, 802 N.E.2d 712, 720 (Ohio Ct. App. 2003).  To plead prior notice under O.R.C.

9    § 1345.09(B), a complaint must aver either (1) that the Ohio Attorney General has promulgated

10   "a specific rule or regulation . . . that specifically characterizes the challenged practice as unfair or

11   deceptive," or (2) that an Ohio court has found the challenged practice "either unconscionable or

12   deceptive" in a publicly available decision.  *Pattie*, 29 F. Supp. 3d at 1055 (internal quotation

13   marks omitted).   "Lack of prior notice *requires dismissal of class action allegations*."   *Id.*

14   (emphasis added); *In re Porsche Cars N. Am., Inc. Coolant Tubes Prods. Liab. Litig.*, 880 F.

15   Supp. 2d 801, 869 (S.D. Ohio 2012) (if a plaintiff does not identify "a rule or case in his or her

16   complaint that satisfies Section 1345.09(B), dismissal of the claim as a class action is proper and

17   the plaintiff may proceed in his or her individual capacity alone"); *see id.* at 869 (rejecting the

18   "argument that Section 1345.09(B) is only relevant at the class certification stage"); *see also*

19   *Marrone v. Philip Morris USA, Inc.*, 850 N.E.2d 31, 33 (Ohio 2006).

20          As even a cursory review of Plaintiff Wynn's allegations makes plain, the SAC does not

21   identify any prior Ohio state-court opinion or Ohio Attorney General regulation deeming illegal

22   practices like those at issue here.  This claim should therefore be dismissed insofar as it seeks to

23   assert claims on behalf of a subclass of Ohio consumers.

24   **F.     Plaintiffs' Claims Are Barred By The Voluntary Payment Doctrine (All Counts)**

25          Plaintiffs' allegations confirm that, before they paid the relevant fees, they were fully

26   aware of the fees' existence and amount.  As a consequence, their claims are barred by the

27   voluntary payment doctrine.

28

The voluntary payment doctrine provides that a "payment voluntarily made with knowledge of the facts affords no ground for an action to recover it back." *Am. Oil Serv. v. Hope Oil Co.*, 15 Cal. Rptr. 209, 213 (Cal. Ct. App. 1961); *see also Steck v. N. Colo. Irrigation Co.*, 35 P. 919, 920 (Colo. Ct. App. 1894). It rests on the recognition that "[t]o allow a person who has made payment of a disputed debt later to seek restitution from the creditor, would be to permit him, by postponing suit, to choose his own time and place for litigation and to change his position from that of a defendant to that of a plaintiff, which would be unfair to the other party." Restatement (First) of Restitution § 71 cmt. b (1937). So long as a plaintiff had full knowledge of the facts, his or her belief that a fee was or was not illegal or improper is irrelevant.[38] Although the voluntary payment doctrine is an affirmative defense, like any affirmative defense it can be resolved on the pleadings if the relevant facts are clear from the face of the complaint. *See, e.g.*, *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984).

Here, even if we assume that Plaintiffs managed to navigate the entire ordering process without reading ***any*** of the multiple disclosures discussed above, their claims are, with one exception,[39] barred by the voluntary payment doctrine. Indeed, their own allegations confirm that, at the latest, they all knew about the fees when they received their bills. *See supra* Section II.D. Yet they paid the bills anyway, even though each could have cancelled service without penalty.[40] Indeed, each could have cancelled within that thirty-day window ***without making any payments***

---

[38]   *See, e.g.*, *Prilliman v. Canon City*, 360 P.2d 812, 812 (Colo. 1961) ("[A] voluntary payment of a fine assessed pursuant to an unlawful or void ordinance cannot be recovered."); *Cincinnati v. Cincinnati Gaslight & Coke Co.*, 41 N.E. 239 (Ohio 1895) ("A payment made by reason of a wrong construction of the terms of a contract, is not made under a mistake of fact, but under a mistake of law, and, if voluntarily, cannot be recovered back."); *Carrero v. LVNV Funding, LLC*, No. 11-62439, 2014 WL 6433214, at *6 (S.D. Fla. Oct. 27, 2014) (applying Florida law); *Randazzo v. Harris Bank Palatine, N.A.*, 262 F.3d 663, 666 (7th Cir. 2001) (applying Illinois law); *In re N.J. State Bd. of Dentistry*, 423 A.2d 640, 643 (N.J. Super. 1980).

[39]   The sole exception of which Comcast is aware is the statutory claim of Plaintiff Bailey (Count 12), because Washington law precludes application of the voluntary payment doctrine to claims asserted under the Washington Consumer Protection Act. *See Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*, 170 P.3d 10, 24 (Wash. 2007) (en banc).

[40]   *See* SAC, Ex. A § 9(b) ("Unless you have signed a minimum term addendum, you may terminate this Agreement for any reason at any time."); Term Agreement ¶ 2 (giving subscribers with Term Agreements 30 days in which to cancel service without penalty).

1   ***at all***, as Comcast offers subscribers a money-back guarantee on new services.[41]  Choosing

2   instead to pay the fees so that they could later file suit is the very sort of conduct that this doctrine

3   is meant to prevent.  *See, e.g.*, Restatement (First) of Restitution § 71 cmt. b (1937).  Because

4   they paid these fees voluntarily, their claims must be dismissed.

5   **G.**      **Plaintiffs Have Not Stated A Claim For Equitable Relief (Counts 3 through 12)**

6          A fundamental prerequisite of a claim for equitable relief is that the plaintiff must lack an

7   adequate remedy at law.  *See, e.g.*, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381

8   (1992) ("It is a basic doctrine of equity jurisprudence that courts of equity should not act . . .

9   when the moving party has an adequate remedy at law.").  That is true of any claim for equitable

10  relief, from claims for unjust enrichment, *see In re Ford Motor Co. Speed Control Deactivation*

11  *Switch Prods. Liab. Litig.*, 664 F. Supp. 2d 752, 763-64 (E.D. Mich. 2009) (applying California

12  law), to claims for injunctive relief under the UCL and CLRA, *see Prudential Home Mortg. Co. v.*

13  *Superior Court*, 78 Cal. Rptr. 2d 566, 573 (Cal. Ct. App. 1998).

14         Here, Plaintiffs have not pleaded—and cannot plead—facts to satisfy that requirement.

15  That is because this action is ultimately one for money damages, which is the quintessential form

16  of ***legal*** relief.  Courts in this district have not hesitated to dismiss such claims where, as here, the

17  plaintiffs have asserted other claims that would, if successful, compensate them monetarily.  *See*

18  *Philips v. Ford Motor Co.*, No. 14-2989, 2015 WL 4111448, at *16-17 (N.D. Cal. July 7, 2015);

19  *Gardner v. Safeco Ins. Co. of Am.*, No. 14-2024, 2014 WL 2568895, at *7 (N.D. Cal. June 6,

20  2014) (dismissing UCL claim because plaintiffs' "claims for breach of contract and breach of the

21  implied covenant of good faith and fair dealing may provide an adequate remedy"); *Durkee v.*

22  *Ford Motor Co.*, No. 14-0617, 2014 WL 4352184, at *3 (N.D. Cal. Sept. 2, 2014); *Rhynes v.*

23  *Stryker Corp.*, No. 10-5619, 2011 WL 2149095, at *3-4 (N.D. Cal. May 31, 2011).  Consequently,

24

25

26  _____
    [41]      *See*   https://customer.xfinity.com/help-and-support/account/comcast-customer-guarantee/;

27  *see also* https://experience.xfinity.com/; Term Agreement ¶ 1 ("If you do not cancel this
    Agreement within 30 days of the date of service installation/activation, as applicable, you will be

28  billed for the services at the rates specified under the Offer.").

1    Counts 3 (unjust enrichment) and 4 (UCL) of the SAC should be dismissed in their entirety, as

2    should Counts 5-12 to the extent they seek injunctive or other equitable relief.[42]

3    **H.     Plaintiffs' Allegations Regarding Counsel and Non-Plaintiffs Should Be Stricken**

4              Rule 12(f) authorizes courts to strike any "immaterial" or "impertinent" material from a

5    complaint.  Although used sparingly, that authority is appropriately exercised where allegations

6    bear "no essential or important relationship to the claim for relief or the defenses being pleaded,"

7    "do not pertain, and are not necessary to the issues in question," or create a "serious risk[] of

8    prejudice . . ., delay and confusion of the issues." *Fantasy Inc.*, 984 F.2d at 1527-28.

9              Here, there are two categories of allegations that fall within the narrow class of material

10   subject to a motion to strike: (1) allegations regarding subscribers who are not parties to this case;

11   and (2) allegations regarding Plaintiffs' counsel and his colleagues who engaged in pretextual

12   communications with Comcast representatives.  As to the first category (SAC ¶¶ 46, 61-62, 133,

13   135-36, 142-43, and 145-46), non-Plaintiff subscribers' allegations about their own experiences

14   ordering and using service are wholly irrelevant to the viability of the ***Plaintiffs'*** claims—which

15   is the only question that is currently before the Court.  Indeed, given that the majority of these

16   non-Plaintiff customers chose not to opt out of arbitration (and thus can never be plaintiffs in this

17   action, whether named or unnamed), the only possible purpose for including their allegations in

18   the SAC is to "confus[e] the issues" before the Court.  *Fantasy Inc.*, 984 F.2d at 1528.

19             And as for the second category (paragraphs 63-71 and 147-48 of the SAC), it should go

20   without saying that counsel should not normally turn themselves into fact witnesses,[43] or pose

21   questions to employees of an adverse party that they know full well is represented by counsel.[44]

---

22   [42]      *See* SAC ¶ 311 (Count 5); *id.* ¶ 324 (Count 6); *id.* ¶ 336 (Count 7); *id.* ¶ 344 (Count 8); *id.*

23   ¶ 356 (Count 9); *id.* ¶ 363 (Count 10); *id.* ¶ 372 (Count 11); *id.* ¶ 380 (Count 12).

       [43]      *See* Cal. R. Prof. Conduct 5-210.

24   [44]      *See* Cal. R. Prof. Conduct 2-100; *United States v. Sierra Pac. Indus.*, 759 F. Supp. 2d

25   1206, 1214 (E.D. Cal. 2010) (finding that counsel violated Rule 2-100 because he "questioned
       certain Forest Service personnel . . . in an attempt to discover and gather evidence and statements

26   from those employees for use in this litigation," and "did so without the consent of the
       government's counsel and without disclosing either the litigation or his status as opposing counsel

27   in that litigation."); Charles W. Wolfram, *Modern Legal Ethics*, § 11.6.2, at 611 (1986) ("The
       prohibition is founded upon the possibility of treachery that might result if lawyers were free to

28   exploit the presumably vulnerable position of a represented but unadvised party").  The SAC
       confirms that counsel knew as early as December 24, 2015 that Comcast had counsel, *see* SAC,

1   Such conduct is both unprofessional and uncharacteristic of the prosecution of legitimate claims.

2   In any event, allegations regarding these communications have no bearing on this case, except

3   perhaps to highlight the extent to which the alleged events have been choreographed by counsel.

4   It follows that they should be stricken as well, and that Plaintiffs should be barred from citing any

5   such communications in the future.[45]

**V.**

**CONCLUSION**

For the foregoing reasons, Comcast respectfully requests that its Motion be granted.

Dated: February 21, 2017

DRINKER BIDDLE & REATH LLP

By: /s/ Michael J. Stortz
    Michael J. Stortz
    Matthew J. Adler

Attorneys for Defendants
COMCAST CORPORATION and COMCAST
CABLE COMMUNICATIONS, LLC

---

Ex. B (Christmas Eve letter from D. Hattis to Defendant's General Counsel), and that he and his colleagues communicated with Comcast employees after that fact.  SAC ¶ 71.

[45] *Sierra Pac. Indus.*, 759 F. Supp. 2d at 1214 ("SPI shall be barred from using information obtained through such contacts").  That should apply with equal force to communications by counsel's agents, which includes not only their paid "attorney investigators," SAC ¶ 70, but also any Plaintiffs or nonparties whose communications originated with or were orchestrated by counsel.  *See* State Bar of California Standing Committee on Professional Responsibility and Conduct Formal Opinion No. 1993–131 (advising that, "[w]hen the content of such communication originates with or is directed by the attorney, the communication is prohibited as indirect communication under rule 2-100.").