Daniel M. Hattis (SBN 232141)
HATTIS LAW PLLC
P.O. Box 1645
Bellevue, WA 98009
Telephone: (650) 980-1990
Facsimile: (425) 412-7171
Email: dan@hattislaw.com

Jason Skaggs (SBN 202190)
SKAGGS FAUCETTE LLP
530 Lytton Ave 2nd FL
Palo Alto, CA 94301
Telephone: (650) 617-3226
Email: jason@skaggsfaucette.com

Tony J. Tanke (SBN 74054)
LAW OFFICES OF TONY J. TANKE
2050 Lyndell Terrace, Suite 240
Davis, CA 95616
Telephone: (530) 758-4530
Email: appeals@tankelaw.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAN ADKINS and CHRISTOPHER ROBERTSON, Individually and/or As Private Attorneys General,<br><br>Plaintiffs,<br><br>v.<br><br>COMCAST CORPORATION and COMCAST CABLE COMMUNICATIONS, LLC,<br><br>Defendants. | Case No. 3:16-cv-05969-VC<br><br>**FIFTH AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

I.      INTRODUCTION AND SUMMARY ................................................................- 1 -

II.     PARTIES ............................................................................................................- 2 -

III.    JURISDICTION AND VENUE ........................................................................- 2 -

IV.     PLAINTIFF DAN ADKINS ..............................................................................- 4 -

V.      PLAINTIFF CHRISTOPHER ROBERTSON.................................................- 12 -

VI.     COMCAST'S INTENTIONAL CALIFORNIA-WIDE AND NATIONWIDE
        SCHEME...........................................................................................................- 19 -

        A.    Comcast Engages in False and Misleading Advertising About the Prices
              It Charges for Its Cable Television Service Packages............................- 21 -

        B.    Comcast's Sales Agents Make False and Misleading Statements About
              the Prices Comcast Charges for Its Cable Television Service Packages ..............- 22 -

        C.    Comcast Lies To Customers Who Enquire or Complain About the Broadcast TV
              Fee or the Regional Sports Fee By Telling Them the Charges Are Taxes or
              Government Fees...................................................................................- 24 -

        D.    Comcast's Form Contracts Do Not Adequately Disclose the Broadcast TV Fee
              or the Regional Sports Fee ....................................................................- 25 -

        E.    Comcast Falsely Advertises Guaranteed, Locked-In Prices for Its Term Contracts,
              When Comcast In Fact Repeatedly Raises Its Prices Mid-Contract Via Increases
              in the Broadcast TV Fee and the Regional Sports Fee .........................- 26 -

        F.    Comcast's Bait-and-Switch Scheme Is Central to Its Marketing Plan and Accounts
              for an Increasingly Large Part of Comcast's Total Revenues and Profits.............- 27 -

VII.    CHOICE OF LAW ............................................................................................- 28 -

CAUSES OF ACTION....................................................................................................- 28 -

COUNT I – Breach of Contract......................................................................................- 28 -

COUNT II – Intentional Misrepresentation ....................................................................- 29 -

COUNT III – California Business & Professions Code § 17200 *et seq.* ("UCL")...............- 31 -

COUNT IV – California Business & Professions Code § 17500 *et seq.* ("FAL")...............- 32 -

COUNT V – California Civil Code § 1750 *et seq.* ("CLRA")...........................................- 35 -

COUNT VI – Permanent Public Injunctive Relief ...........................................................- 39 -

PRAYER FOR RELIEF ..................................................................................................- 41 -

JURY DEMAND .............................................................................................................- 42 -

FIFTH AMENDED COMPLAINT
CASE NO. 3:16-CV-05969-VC

Plaintiffs, individually and/or as private attorneys general, allege on personal knowledge, investigation of their counsel, and on information and belief, as follows:

## I.   INTRODUCTION AND SUMMARY

1.      This lawsuit is about a massive bait-and-switch scheme perpetrated by Comcast Corporation and Comcast Cable Communications, LLC (collectively, "Comcast") on Plaintiffs and on the general public whereby Comcast falsely advertises its cable service packages for much lower prices than it actually charges.

2.      Comcast's advertising, and its sales staff, misled Plaintiffs into falsely believing that the advertised price for Comcast's service packages is the actual price they would pay except for equipment charges and bona fide taxes and government fees.

3.      However, Comcast intentionally chose to exclude from the advertised price of its service packages certain invented fees (the Broadcast TV Fee and the Regional Sports Fee, collectively, the "Fees"). Yet the Fees are discretionary disguised double-charges for the channels that Comcast promised were *already included* in the lower advertised package price (e.g., ABC, CBS, NBC, FOX, and local sports channels).

4.      Comcast *never* qualifies the advertised price with an asterisk or other adjacent marker, and the hidden disclosures that Comcast makes about the Fees are not only inadequate, but are themselves deceptive. Comcast's disclaimers are designed to mislead consumers like Plaintiffs into falsely believing the Fees are taxes or government-related charges over which Comcast has no control.

5.      When customers inquire or complain about the Fees, Comcast doubles down on its initial deception by engaging in a practice of outright lying to customers. Comcast tells customers that the Fees are taxes or government-related charges rather than what they truly are: self-created fees used to double-charge Comcast's customers for the same channel programming that Comcast promised would be included in the advertised price.

6.      Comcast perpetrates this scheme to hook and trap customers like Plaintiffs into one-year or two-year contracts at supposedly "guaranteed" locked-in rates with significant early termination penalties, with the intent or effect of charging the customers more than it has

1    promised via the deceptive and hidden Fees.

2         7.       Even worse, as both Plaintiffs experienced, a few months into customers'

3    purported fixed-price contracts Comcast raises its prices *even higher* on these trapped customers

4    via the backdoor method of increasing the Fees, breaching Comcast's agreements with them.

5         8.       Comcast has increased the Fees by 800% since they were first introduced in 2014,

6    and the Fees now add as much as $12 per month to California customer cable bills. Plaintiffs

7    estimate that Comcast earns more than $2 billion per year nationwide from these sham double-

8    charges – more than $200 million annually from its 2 million California television subscribers

9    alone.

10        9.       Plaintiffs bring this lawsuit on behalf of themselves individually to recover their

11   damages and/or restitution, and/or as private attorneys general to put an end to Comcast's bait-

12   and-switch schemes and to prevent future injury to the general public.

13                             **II.    PARTIES**

14        10.      Plaintiff Dan Adkins is an individual residing in Oakland, California.

15        11.      Plaintiff Christopher Robertson is an individual who resided in Sacramento,

16   California during the term of the Comcast service contract which is the subject of this lawsuit.

17        12.      Defendant Comcast Corporation is a multinational, mass media company

18   headquartered in Philadelphia, Pennsylvania, and incorporated in Pennsylvania. It is the largest

19   broadcasting and cable company in the world by revenue, and it is the largest home television and

20   Internet service provider in the United States.

21        13.      Defendant Comcast Cable Communications, LLC ("Comcast Cable"), according

22   to Comcast Corporation's 2015 Form 10-K, is a "100% owned cable holding company

23   subsidiary" of Comcast Corporation. Comcast Cable is headquartered in Philadelphia,

24   Pennsylvania, and incorporated in Delaware.

25        14.      Comcast markets its cable services under the XFINITY brand name.

26                     **III.    JURISDICTION AND VENUE**

27        15.      The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §

28   1332(a)(1) as the amount in controversy exceeds $75,000 and the matter is between citizens of

1  different states.

2        16.    This Court has personal jurisdiction over Comcast Cable because: (1) Comcast

3  Cable is authorized to do business and regularly conducts business in California; (2) Comcast

4  Cable has marketed, sold and issued cable service plans in California including to Plaintiffs, and

5  (3) Comcast Cable has entered into contracts with Plaintiffs and other California consumers

6  regarding their cable service plans. Comcast Cable has sufficient minimum contacts with this

7  state to render the exercise of jurisdiction by this Court permissible.

8        17.    This Court has personal jurisdiction over Comcast Corporation because Comcast

9  Corporation has entered into contracts with Plaintiffs and California consumers regarding their

10  cable service plans. Attached at **Exhibit A** is the Comcast Agreement for Residential Services

11  (the "Subscriber Agreement") posted on Comcast's website as of January 14, 2016. The very first

12  sentences of the Subscriber Agreement explicitly state that Comcast Corporation is a party to the

13  contract:

14          ABOUT THIS AGREEMENT, OUR SERVICES, AND YOUR RIGHTS. XFINITY® Service(s) will be provided to you ("you," "your," or "Customer") on

15  the terms and conditions set forth in this Agreement for Residential Services (the "Agreement") and applicable law by the operating company subsidiary of

16  **Comcast Corporation** that (i) owns and/or operates the cable television system in your area and/or (ii) the subsidiary that is the XFINITY Digital Voice service

17  provider or Unlimited Select and Local Select service provider **("Comcast," "we," "us," or "our"). For purposes of this Agreement, "affiliate" means any**

18  **entity that controls, is controlled by or is under common control with**

19  **Comcast Corporation.**

20  **Exhibit A**, p. 1 (emphasis added).

21        18.    The terms "Comcast" and "affiliate" are then used throughout the Subscriber

22  Agreement.

23        19.    This Court also has personal jurisdiction over Comcast Corporation because

24  Comcast Corporation executives are responsible for business aspects of Comcast cable

25  operations. For example, David N. Watson is simultaneously President and CEO of Comcast

26  Cable and Senior Executive Vice President of Comcast Corporation. Comcast's official

27  biography of Mr. Watson on the Comcast corporate website states: "David N. Watson serves as

28  President and Chief Executive Officer, Comcast Cable *and* Senior Executive Vice President,

Comcast Corporation. *In this role, he is responsible for all business aspects of the Company's cable operations*" (emphasis added). See Comcast Corporation's website at http://corporate.comcast.com/news-information/leadership-overview/david-n-watson, a print-out of which is attached as **Exhibit B**. Further evidence of Comcast Corporation's involvement in business aspects of Comcast cable operations include Comcast's responses to Plaintiffs' counsel Daniel Hattis' cease and desist letters: Comcast's responses were written on Comcast Corporation letterhead (e.g. the footer of the letterhead states the address for Comcast Corporation and references the web address www.comcastcorporation.com), and the responses referenced actions of "Comcast" or "the company" and made no reference to Comcast Cable. E.g., **Exhibit C**. Finally, when Plaintiffs' counsel Daniel Hattis emailed Comcast Corporation's counsel Seamus Duffy on November 28, 2016 and asked, "Could you please get back to me re: who are the entities who are the proper defendant(s) in the case," Mr. Duffy responded by email "Hey Dan, if you are just naming the parent Comcast CORP you should be fine. People sometimes name the operating entity, which I believe is Comcast Cable Communications LLC, but in my experience we don't make an issue between the two so you are fine with CORP." See **Exhibit D**.

20.     Venue is proper under 28 U.S.C. §§ 1391(a) and (b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## IV.    PLAINTIFF DAN ADKINS

21.     After moving to a new home in Oakland, California, Plaintiff Dan Adkins went online to Comcast's website on September 26, 2016 to research Comcast's service package offerings. Mr. Adkins wanted to sign up for a package with television and high speed Internet that would work with his TiVo video recorder device.

22.     Based on a review of Comcast's offerings, Mr. Adkins narrowed his choice to two packages: Comcast's Starter Double Play package at $69.99 per month versus the Starter Double Play with "Blast" (i.e. faster Internet) at $79.99 per month.

23.     On the offer page for the packages, Mr. Adkins noticed that next to the prominently advertised package prices there was small print which stated "per month for 12 mo. With 2-year agreement." However, there was no asterisk or qualifier next to the advertised prices,

and nothing on the page stated what the price would be in months 13-24. This made Mr. Adkins wary, because it was not clear what he would be charged after the first year.

24.    Mr. Adkins then noticed a small text link below the "Add to Cart" button for each package labeled "Pricing & Other Info." Mr. Adkins clicked on the "Pricing & Other Info." link, and a pop-up dialog box then appeared containing over 20 lines of small print. The "Pricing & Other Info." text was identical for both packages, and buried in this fine print was the information he was looking for, i.e. what the price would be for months 13-24. The tiny text stated that for both the $69.99 and the $79.99 packages, the price for months 13-24 would be $89.99.

25.    Based on these representations, Mr. Adkins decided on the $79.99 Starter Double Play with Blast Internet.

26.    Mr. Adkins also decided to take screenshots of the offer page and of nearly every page of the order process as he viewed them that day on September 26, 2016, to make sure he had documentation of Comcast's offer to him and so he could refute any possible later surprise charges that were inconsistent with what Comcast had promised him.

27.    Mr. Adkins took a screenshot of the offer page which advertised the Starter Double Play packages. The screenshot of the offer page taken by Mr. Adkins is attached as **Exhibit E**. There was no asterisk or other qualifier next to the prices; the only small print was the reference to the price being for the first 12 months. The ad stated that the prices included "140 Channels" of TV, and that the packages included "24/7 Sports coverage on all major networks." In making his decision to proceed with his purchase, Mr. Adkins relied on these representations that the $79.99 price for the Starter Double Play with Blast was the total monthly cost for those channels, including the major broadcast TV channels, plus Blast Internet. Mr. Adkins then took a screenshot of the pop-up dialog box which appeared after he clicked on the "Pricing & Other Info." link. See **Exhibit F**.

28.    Mr. Adkins then clicked on the prominent blue "Add to cart" button. Mr. Adkins then viewed the "TV Options" page. The screenshot taken by Mr. Adkins of the TV Options page is attached as **Exhibit G**. Mr. Adkins viewed the "My Order Summary" box on the right side of the page which listed the various "Options" that were "Included" at no extra charge, "One-time

Charges" of $14.99, and the "Monthly Total" of $79.99. Based on these representations, Mr.

Adkins understood that the $79.99 "Monthly Total" price was the total amount Comcast would

charge him for television and Internet service with the exception of taxes and government-related

fees (Mr. Adkins did not require any additional television equipment and already had his own

modem). Mr. Adkins did not want the included X1 Digital Service receiver for his television,

because he wanted to choose a cable card instead for his TiVo. However, there was no option for

him to choose a cable card on the page. The page made no mention of the Broadcast TV Fee or

the Regional Sports Fee.

29.     Mr. Adkins then clicked on the blue "Next" button. He then viewed the "Internet

Options" page. The screenshot taken by Mr. Adkins of the Internet Options page is attached as

**Exhibit H**. The identical "My Order Summary" box was on the right side. Mr. Adkins accepted

the default option to "use my own equipment" for no charge because he owned his own modem.

The page made no mention of the Broadcast TV Fee or the Regional Sports Fee.

30.     Mr. Adkins then clicked on the blue "Next" button. He then viewed a page with

installation options. The screenshot taken by Mr. Adkins of the installation options page is

attached as **Exhibit I**. He accepted the default option of self installation and standard shipping for

the self-install kit. Mr. Adkins observed the identical "My Order Summary" box on the right side

as compared to the two previous pages. The page made no mention of the Broadcast TV Fee or

the Regional Sports Fee.

31.     On each page displaying the "My Order Summary" (see **Exhibits G-I**), Comcast

displayed to Mr. Adkins a prominent blue question mark next to the "Monthly Total" amount.

Upon hovering over the question mark, a text box appeared stating:

> **This is the base monthly total of all recurring charges for the services you
> have selected**. It does not include tax or one-time charges (such as installation or
> Pay-Per-View fees) that may appear on individual bills.

(Emphasis added.) Mr. Adkins viewed and relied upon this language and statement that the

"Monthly Total" price of $79.99 was going to be the total recurring monthly discretionary

charges by Comcast for the services it was providing. Although Mr. Adkins did not take a

screenshot of this language, an example of how this text box is displayed when the consumer

hovers over the prominent blue question mark is provided in **Exhibit J** (which contains screenshots taken March 6, 2016 of a page in the online order process for service in the Sacramento, California area, red highlight added).

32.    Mr. Adkins then clicked on the blue "Next" button on the installation page, which brought him to an account info page where he entered in his personal information and his payment information. These pages made no mention of the Broadcast TV Fee or the Regional Sports Fee.

33.    After entering and confirming his personal information and payment information, Mr. Adkins was brought to the order submittal page. The screenshot taken by Mr. Adkins of the order submittal page is attached as **Exhibit K**. The order submittal page contained yet another list of all the services and items included in the package, and at the bottom showed a "Total" of "Monthly Charges" of $79.99. As always, there was no asterisk or qualifier regarding this total monthly price. Mr. Adkins observed and read the fine print at the bottom of the page which stated: "Equipment, installation, taxes and fees, including regulatory recovery fees and other applicable charges extra." This fine print, like the rest of the page and all the other pages of the online order process, made no mention of the Broadcast TV Fee or the Regional Sports Fee.

34.    Mr. Adkins observed some small text above the large blue "Submit Your Order" button, with a check box which stated that by checking the small box he represented "I have read and agree to the Comcast Agreement for Residential Services" and "agree to the terms of the Minimum Term Agreement." Mr. Adkins clicked on the link for the Comcast Agreement for Residential Services, which displayed the Subscriber Agreement with 23 pages of small type. Mr. Adkins took a screenshot of the agreement, and quickly scanned the agreement, specifically looking to see if there was an arbitration clause and if it was possible to opt out of the arbitration clause. Meanwhile, the 23 page Subscriber Agreement made no mention of the Broadcast TV Fee or the Regional Sports Fee.

35.    Mr. Adkins then returned to the order submittal page, and clicked on the link labeled "Minimum Term Agreement." A pop up window of text then appeared, which Mr. Adkins took a screenshot of (the screenshot is attached as **Exhibit L**). The text was not of the actual

Minimum Term Agreement; instead, it simply mentioned the existence of an early termination fee and stated that a Minimum Term Agreement would later be emailed or mailed to the customer. The *entirety* of the displayed text is as follows (italics are added):

> **Minimum Term Agreement**. The offer you selected requires a minimum term agreement and is subject to an early termination fee if all XFINITY services are cancelled during the agreement term. *A copy of the agreement will be sent to the mail or email address you provided*. You have the option to cancel the minimum term agreement within 30 days of the date the services under the offer are installed/activated without incurring an early termination fee. If you wish to cancel the agreement, you must contact Comcast by calling 1-800-XFINITY. If you cancel the agreement during the 30 day period, the charges for your remaining services may increase to the non-term contract rate. If you do not cancel the minimum term agreement within the 30 day period, the terms of the minimum term agreement will automatically apply.

36.     Thus, despite Comcast requiring Mr. Adkins to check the box on the order submittal page that "I have read and agree to the terms of the Minimum Term Agreement," it was *impossible* for him to actually do so, because as the pop-up box states, the actual (two-page) Minimum Term Agreement document would not be sent to him until later – if it was ever sent at all. Therefore, Mr. Adkins did not, and could not have possibly agreed to the Comcast Minimum Term Agreement prior to submitting his order online.

37.     Mr. Adkins then submitted his order by clicking on the blue "Submit Your Order" button at the bottom of the page.

38.     Relying on Comcast's representations and promises to him in its website advertising and throughout the online purchase process, Mr. Adkins reasonably expected and believed that his total monthly bill for his television and Internet service for months 1-12 would be $79.99 plus taxes and government-related fees, and he understood that his total monthly bill for months 13-24 would be $89.99 plus taxes and government-related fees. Mr. Adkins had agreed to commit himself to a 2-year contract, with an early termination fee, in reliance on Comcast's promise of a guaranteed and predictable lower price for his service during those two years.

39.     Later that day, on September 26, 2016, Mr. Adkins received an "Order Summary" email from Comcast stating his order was being reviewed and that the order would not be

finalized until he received a confirmation email. This Order Summary email is attached as **Exhibit M**. The Order Summary stated his "Monthly Fees" would be $79.99 and "One-time Fees" would be $14.99. The email did not mention the Broadcast TV or Regional Sports Fee, even in the fine print at the bottom of the email.

40.     That same day on September 26, 2016, Mr. Adkins opted out of Comcast's arbitration clause on Comcast's "Arbitration Opt Out" webpage.

41.     On September 28, 2016, two days after placing his order online, Mr. Adkins called Comcast customer service to ask about two concerns: (1) he wanted his service to start on Saturday October 1, 2016 (the date he would be moving into his new home), but he never received the "confirmation email" that the September 26, 2016 "Order Summary" email told him would be forthcoming; and (2) he wanted a cable card for his TiVo instead of the cable box. The first agent he spoke to was unable to help him, so he called a second time. The second Comcast agent asked him to confirm that "the order was placed for a Double Play Starter XF at $79.99, you own your own modem, and requested self installation kit, correct?" Mr. Adkins confirmed this was correct. The agent was able to process the order after confirming the prior tenant had terminated service, and told Mr. Adkins that Mr. Adkins could switch the box for a cable card at a local Comcast service center.

42.     Mr. Adkins never received an order confirmation email.

43.     Mr. Adkins received his first bill on October 6, 2016. See **Exhibit N**. Mr. Adkins noticed that Comcast was charging him a $5.00 Broadcast TV Fee and a $3.00 Regional Sports Fee, which were listed in the "Other charges and credits" section and which he thought may possibly be additional discretionary charges rather than government-related taxes or fees, contrary to Comcast's promise to him that Comcast's discretionary monthly service charges would total $79.99. Mr. Adkins also noticed that Comcast was charging him an additional $15.00 for Blast Pro Internet, contrary to Comcast's repeated promises to him on the web offer page and throughout the order process that Blast Pro Internet was "Included" for no additional charge (in fact, Comcast had called the $79.99 package he selected "Starter Double Play with Blast!"). See Mr. Adkins' screenshots of the offer page and the online order process at **Exhibits E-I, K**.

44.     Upset by these extra charges, Mr. Adkins wrote a letter to Comcast, which he mailed on October 7, 2016, asking Comcast to remove the Broadcast TV Fee, the Regional Sports Fee, and the Blast Pro Internet monthly charges. See **Exhibit O**. Mr. Adkins included print-outs of the screenshots he had taken of the order process showing that Comcast had promised him that Blast Pro Internet was included in his plan at no additional charge. He also asked that Comcast give him a $2.50 monthly credit for using a cable card in his own device pursuant to Comcast policy, and questioned whether he had been double charged for the self-install kit.

45.     On or about October 7, 2016, Mr. Adkins opted out of the Comcast's arbitration agreement a second time, this time taking a screenshot so that he had documentary evidence of his opt-out.

46.     Mr. Adkins never signed or otherwise agreed to the document which Comcast dubs the Minimum Term Agreement.

47.     Comcast never mailed, emailed, or otherwise transmitted or presented to Mr. Adkins a copy of a Minimum Term Agreement.

48.     Mr. Adkins was not aware of the existence of a purported 30-day Money-Back Guarantee by Comcast, and this option was never presented to him in any of his communications with Comcast regarding his complaints.

49.     On October 8, 2016 Plaintiffs' counsel faxed and emailed a letter to Comcast on behalf of Mr. Adkins to Comcast Senior Vice President Thomas R. Nathan demanding, among other things, that Comcast stop its deceptive practices and return all money paid by Comcast customers for the Broadcast TV Fee and Regional Sports Fee. See **Exhibit Q**. A Comcast litigation paralegal acknowledged receipt of the October 8, 2016 letter by an email reply on October 10, 2016. Plaintiffs' counsel also mailed a notice letter to Comcast by certified mail return receipt on October 10, 2016. Comcast did not respond to the letters.

50.     On December 30, 2016, Mr. Adkins called Comcast to again complain about the excess $15.00 Comcast was charging him each month for Blast Pro Internet. Comcast agreed to remove and reimburse him for the Blast Pro Internet double-charges.

51.     However, while Comcast reimbursed Mr. Adkins for past Blast Pro Internet double-charges, and is no longer charging Mr. Adkins an additional $15.00 per month for Blast Pro Internet, Comcast in fact *removed* Blast Pro Internet from Mr. Adkin's service package. Rather than providing the promised higher speed Blast Pro Internet at the promised price, Comcast instead lowered Mr. Adkins' Internet speed to the base speed, such that Comcast is failing to provide the promised Blast Pro Internet as part of his service package.

52.     Starting on Mr. Adkins' July 2017 bill, Comcast raised the Broadcast TV Fee from $5.00 to $7.00 and the Regional Sports Fee from $3.00 to $5.00. Mr. Adkins never agreed to these double-charges for the channels in his service package in the first place. Further, the main reason Mr. Adkins agreed to a 2-year contract was in reliance on Comcast's promise of a guaranteed and predictable lower price for his service for those two years. Now, 9 months into his 24-month fixed-rate contract, Comcast was utilizing the Fees as a sneaky, backdoor way to increase its rates in breach of Comcast's agreement with him.

53.     As a current Comcast subscriber, Mr. Adkins is in jeopardy of impending, actual and/or imminent injury in the future. For example, for each month in the future, he will be forced to pay the Fees. Mr. Adkins will also be subject to Comcast's unilateral, unknowable increases in the Fees despite his being in the middle of a purportedly fixed-rate contract.

54.     Mr. Adkins does not have objections to the quality of the cable services which Comcast provides. But Mr. Adkins objects to the fact that Comcast is charging him a price which is different from and higher than the price Comcast advertised and/or continues to promise and advertise.

55.     Like many consumers and current Comcast customers, Mr. Adkins is regularly presented with advertising from Comcast regarding Comcast's cable television and other services. In many of these advertisements, Comcast is attempting to sell Mr. Adkins additional services or to fold Mr. Adkins' current services into a larger package of services.

56.     When his Comcast contract expires in September 2018, Mr. Adkins will have to decide whether or not to keep subscribing to Comcast. Mr. Adkins would seriously consider

1   continuing to subscribe to Comcast based on a decision regarding which provider advertised and

2   offered the best quality at the lowest truthful price.

3        57.    Mr. Adkins faces the threat of actual and/or imminent harm by not being able to

4   rely with any confidence upon the truthfulness of Comcast's future advertising. Comcast's false

5   advertising threatens to invade Mr. Adkins' statutory right (under, without limitation, California's

6   Unfair Competition Law, False Advertising Law and Consumers Legal Remedies Act) to receive

7   truthful information from Comcast about its services. Mr. Adkins might decide that Comcast

8   offers the highest quality product yet decline to purchase Comcast or upgrade his services

9   because he is unsure if he can rely upon Comcast's advertising. Or Mr. Adkins might purchase or

10  upgrade Comcast cable services in the future as he may reasonably, but incorrectly, assume that

11  Comcast has cleaned up its act and is now advertising truthfully about its prices. The bottom line

12  is that Mr. Adkins should not be put to the task of sorting out which of Comcast's future

13  representations regarding the prices of its cable television service packages are truthful and which

14  are misleading, deceptive or false; California law relieves him of that burden.

15       58.    In sum, Mr. Adkins relied upon Comcast's promises, misrepresentations, and

16  omissions, which in conjunction with Comcast's acts and practices alleged herein caused Mr.

17  Adkins to suffer harm, injury in fact, and lost money or property. If not enjoined by order of this

18  Court, Comcast will continue to injure Mr. Adkins through the misconduct alleged herein.

19       **V.**    **PLAINTIFF CHRISTOPHER ROBERTSON**

20       59.    Prior to November 2015, Plaintiff Christopher Robertson, then a resident of

21  Sacramento, California, subscribed to DirecTV for television and AT&T for Internet and phone

22  service. Towards the end of 2015, he learned that AT&T was going to increase the monthly

23  service rate from approximately $40.00 per month to approximately $55.00 per month.

24  Meanwhile, Mr. Robertson did not watch much television and decided he did not need his

25  DirecTV subscription.

26       60.    Prior to his signing up with Comcast on November 9, 2015, Mr. Robertson

27  received two direct mail advertising flyers from Comcast promoting its cable services. Both flyers

28  were substantially similar in format, style, and content, differing primarily in the prices and the

specific included features in the advertised service packages. A copy of one of the flyers is attached as **Exhibit S**.

61.     The first page of the flyer at **Exhibit S** prominently advertises a price of "$89.99 per month for 12 months" for a "Triple Play" package of TV, Internet, and Voice, which is purportedly discounted from a strike-through price of $99.00. There is no asterisk or qualifier next to the giant "$89.99" advertised price, and there is no mention of the Broadcast TV Fee or the Regional Sports Fee on the page. The first page of the mailer states that the $89.99 price includes "Over 140 channels" and lists bullets with other features that are included in the package. There is no fine print anywhere on the first page of the mailer, which features in the footer Comcast's phone number in huge font to "CALL NOW!". Mr. Robertson ignored the second page of the flyers, which did not appear to have any information about the pricing or details regarding the service. Mr. Robertson did not notice or read the fine print which was *only* on the bottom of the second page and which was not referenced by the first page.

62.     The flyers piqued Mr. Robertson's interest in what other offers were available from Comcast. Mr. Robertson went to Comcast's website and began researching Comcast's service offerings. On Comcast's website, Mr. Robertson read various statements in which Comcast said it had made improvements including in customer service. Mr. Robertson priced out various Comcast offerings available to him, and determined that the advertised price for a bundle package of Internet plus basic TV at $49.99 was cheaper than the price for high speed internet alone.

63.     On or about November 9, 2015, Mr. Robertson returned to the Comcast website. Mr. Robertson selected the $49.99 Internet Plus 25 Plan on an offer web page, and proceeded to go through the online purchase process. The package included only a few television channels (primarily the broadcast TV channels ABC, CBS, NBC and FOX which Comcast indicated were included in the $49.99 plan price), along with broadband Internet.

64.     The web pages Mr. Robertson viewed during the online purchase process were substantially similar in format, style, and content to the pages viewed by Plaintiff Dan Akins (see **Exhibits E-K**), differing primarily in the prices and the specific included features.

65.     On the offer page for the Internet Plus 25 Plan (similar in format to the offer page at **Exhibit E**), Mr. Robertson observed the prominently advertised $49.99 price, which was offered pursuant to a 1-year agreement. Mr. Robertson did not notice, or have any reason to search for and click on – given there was no asterisk or other qualifier next to the $49.99 advertised price – the small "Pricing & Other Info." text link that was below the "Add to Cart" button.

66.     On each page of the online purchase process, Comcast prominently displayed to Mr. Robertson the $49.99 price as the "Monthly Total." Next to this "Monthly Total" amount was a prominent blue question mark which caused to display the following representation viewed by Mr. Robertson: "This is the base monthly total of all recurring charges for the services you have selected. It does not include tax or one-time charges (such as installation or Pay-Per-View fees) that may appear on individual bills."

67.     Based on these representations, Mr. Robertson understood that the $49.99 "Monthly Total" price was the total amount Comcast would charge him for television and Internet service with the exception of taxes and government fees (Mr. Robertson did not require any additional television equipment and already had his own modem).

68.     Mr. Robertson went through most of the online process. Prior to submitting the order, he entered into an online chat with a Comcast agent by clicking on an online chat dialog box which popped up on one of the purchase process pages.

69.     Mr. Robertson told the chat agent he was interested in the Internet Plus 25 plan. Mr. Robertson asked the agent what the total monthly bill would be for the $49.99 plan, and told the agent he wanted to confirm other fees would not be later added to the bill. The agent assured Mr. Robertson there would be no extra charges with the exception of taxes and government fees. The agent did not mention the existence of the Broadcast TV Fee, and Mr. Robertson was never informed about the Broadcast TV Fee during the online order process.

70.     Relying on the representations of the Comcast agent, as well as on his understanding of Comcast's representations in its flyer and online as described above, Mr. Robertson placed the order for service online.

71.    However, Mr. Robertson's order was not fully processed by Comcast.

72.    On November 13, 2015, Mr. Robertson called Comcast to ensure his order was processed. The agent he spoke to told Mr. Robertson she had to "re-put the order in," and that it was "exactly the same as what it was before" (as he had previously submitted online), differing only in that the agent said she added an Internet speed upgrade for an additional $5.00 per month.

73.    The telephone agent told Mr. Robertson that the total monthly price would be "$54.99 for the first 12 months." The agent stated that "the normal price of this package would be $77.95, so you have that discount for $54.99 for the first year."

74.    The telephone agent made no reference to or disclosure of the Broadcast TV Fee.

75.    The telephone agent made no reference to or disclosure of any purported 30-day Money-Back Guarantee by Comcast.

76.    The telephone agent then transferred Mr. Robertson to an automated interactive voice response ("IVR") system to activate his account.

77.    The IVR system informed Mr. Robertson that the service package he had selected required a Minimum Term Agreement, asked him to confirm his identity, and told him that a Minimum Term Agreement "will be sent to the mail or email address you provided."

78.    The IVR system told Mr. Robertson that "Under the agreement, if you cancel or downgrade any services included with your package before the agreement expires, you will be billed the early termination fee specified in this agreement, unless you cancel within the first 30 days after installation or activation, as applicable."

79.    The IVR system did not state any other terms of the Minimum Term Agreement.

80.    The IVR system made no reference to or disclosure of the Broadcast TV Fee.

81.    The IVR system made no reference to or disclosure of any purported 30-day Money-Back Guarantee by Comcast.

82.    Based on Comcast's representations and promises to him in its flyers, on its website, by the Comcast chat agent, and by the Comcast telephone agent, Mr. Robertson reasonably expected and believed that the total monthly bill for his television and Internet service for 12 months would be $54.99 plus taxes and government fees.

83.     Mr. Robertson had agreed to commit himself to a one-year contract, with an early termination fee, in reliance on Comcast's promise of a guaranteed fixed lower price for his service for those twelve months.

84.     Mr. Robertson never signed a Minimum Term Agreement document, and never agreed to its terms.

85.     Comcast never mailed, emailed, or otherwise transmitted or presented to Mr. Robertson a copy of a Minimum Term Agreement.

86.     Mr. Robertson received his first bill on or about November 14, 2015. He was surprised to see that the bill was $73.94, much higher than Comcast had promised. Upon further examination of the bill, Mr. Robertson saw a $6.00 Video Transfer Fee, a $6.00 CHSI Transfer Fee, and a $3.25 Broadcast TV Fee.

87.     Mr. Robertson initiated an online chat on Comcast's website with a customer service agent, and he asked that these fees be removed from his bill. The chat agent said he could remove the Video Transfer Fee and CHSI Transfer Fee. The agent apologized that nobody had told Mr. Robertson about the Broadcast TV Fee, but told him that it was impossible to waive the fee because it was a fee all customers had to pay. The agent was unable to explain or define what the Broadcast TV Fee was.

88.     On December 2, 2015, Mr. Robertson opted out of Comcast's arbitration clause on Comcast's "Arbitration Opt Out" webpage.

89.     On December 24, 2015, Plaintiffs' counsel mailed a letter on behalf of Mr. Robertson to Comcast demanding that Comcast end its unlawful scheme and return all money Comcast customers paid for the Broadcast TV Fee and Regional Sports Fee. See **Exhibit U**.

90.     On February 25, 2016, Comcast Senior Vice President Thomas R. Nathan mailed a response letter refusing to change Comcast practices or refund any money. See **Exhibit C**.

91.     On March 19, 2016 Mr. Robertson initiated another online chat with a Comcast customer service agent. Mr. Robertson asked the agent to remove the Broadcast TV Fee charges from his bills.

92.     The agent stated that the Broadcast TV Fee was a "Government approved charge implemented by Comcast to all cable service subscribers."

93.     Mr. Robertson complained to the agent that he had not been told about the charge, and that "I signed a 1 year agreement to pay a specific amount for a specific service from Comcast, that is the amount I should be paying each month." He stated that "Comcast told me one price, then charged me another."

94.     The agent responded that the "Broadcast TV Fee is part of the fees for having cable service which is on top of the service price you currently have."

95.     The agent refused to remove the Broadcast TV Fee charges from Mr. Robertson's bill, stating "it cannot be refunded … since you have agreed to sign up for the package with us."

96.     In February 2016 Mr. Robertson received his February 8, 2016 bill. On page 2 of the bill in small print was a notice that effective July 1, 2016, Comcast would be raising the Broadcast TV Fee from $3.25 to $5.00. See **Exhibit V**.

97.     On Mr. Robertson's May 8, 2016 bill, Comcast appended a "Products and Services Price List" which stated that "Starting on July 1, 2016 the following XFINITY services and fees will be changing." The list showed that the Broadcast TV Fee would be increasing on 7/1/2016 to $5.00. Yet contrary to the stated upcoming increase, a statement at the bottom of the page declared: "If you're currently receiving services on a promotional basis, under a minimum term agreement associated with a specific rate, or in the guaranteed period of one of our SurePrice plans, the prices for those specific services will not be affected during the applicable period." See Mr. Robertson's May 8, 2016 bill at **Exhibit W**.

98.     Starting on Mr. Robertson's July 8, 2016 bill, Comcast did in fact increase the Broadcast TV Fee charge on Mr. Robertson's bill from $3.25 to $5.00.

99.     Mr. Robertson never agreed to this double-charge for the broadcast channels – which comprised nearly all of the few channels included in his package – in the first place. Further, Mr. Robertson agreed to a one-year contract, despite the existence of an early termination fee, in reliance on Comcast's promise of a guaranteed and fixed lower price for his service during those twelve months. Yet now, with 4 months still remaining on his 12 month contract, Comcast

was utilizing the Broadcast TV Fee as a sneaky, backdoor way to increase its rates in breach of Comcast's agreement with him.

100.    Mr. Robertson also noticed on his July 2016 bill that Comcast had added a five dollar fee for his Internet "Speed Increase," removing a supposed "Service Discount" of $5.00 he was previously receiving.

101.    Soon after Mr. Robertson's one-year contract with Comcast expired at the end of 2016, Mr. Robertson terminated his service with Comcast.

102.    Mr. Robertson did not have objections to the quality of the cable television service which Comcast provided. But Mr. Robertson objects to the fact that Comcast charged him a price which was different from and higher than the price Comcast promised and advertised and/or continues to promise and advertise.

103.    Mr. Robertson faces the threat of actual and/or imminent harm by not being able to rely with any confidence upon the truthfulness of Comcast's future advertising. Mr. Robertson would seriously consider subscribing to Comcast in the future based on a decision regarding which provider advertised and offered the best quality at the lowest truthful price. Comcast's false advertising threatens to invade Mr. Robertson's statutory right (under, without limitation, California's Unfair Competition Law, False Advertising Law and Consumers Legal Remedies Act) to receive truthful information from Comcast about its services. Mr. Robertson might decide that Comcast offers the most suitable product yet decline to purchase Comcast because he is unsure if he can rely upon Comcast's advertising. Or Mr. Robertson might purchase Comcast cable services in the future as he may reasonably, but incorrectly, assume that Comcast has cleaned up its act and is now advertising truthfully about its prices. The bottom line is that Mr. Robertson should not be put to the task of sorting out which of Comcast's future representations regarding the prices of its cable television service packages are truthful and which are misleading, deceptive or false; California law relieves him of that burden.

104.    Mr. Robertson relied upon Comcast's promises, misrepresentations, and omissions, which in conjunction with Comcast's acts and practices alleged herein caused Mr.

1

Robertson to suffer harm, injury in fact, and lost money or property. If not enjoined by order of

2

this Court, Comcast will continue to injure Mr. Robertson through the misconduct alleged herein.

3

## VI.   COMCAST'S INTENTIONAL CALIFORNIA-WIDE AND NATIONWIDE SCHEME

4

5

105.    The experiences of Plaintiffs Dan Adkins and Christopher Robertson are typical of

6

millions of consumers throughout California and the United States, who since 2014 have been

7

victims of Comcast's intentional nationwide bait-and-switch scheme of charging more for its

8

services than Comcast advertised and promised them it would charge.

9

106.    Plaintiffs bring this lawsuit on behalf of themselves individually and/or as private

10

attorneys general on behalf of the general public.

11

107.    Plaintiffs seek public injunctive relief for the benefit of millions of other California

12

consumers. If successful, the lawsuit will also likely benefit tens of millions of consumers

13

nationwide because the Comcast advertising practices which are the subject of this Complaint are

14

uniform and standard throughout the country.

15

108.    Comcast began perpetrating this Broadcast TV Fee and Regional Sports Fee bait-

16

and-switch scheme in 2014. Prior to 2014, Comcast included all programming charges for the

17

broadcast channels (like it did for all the other channels Comcast promised and provided to its

18

customers) in the advertised and billed "sticker price." After all, paying television networks for

19

video content and transmission rights is a basic cost of doing business for a cable company, and

20

one would expect any such charges to be included in Comcast's advertised and stated price for

21

television service packages which included those channels.

22

109.    In January 2014, Comcast introduced the Broadcast TV Fee as a shady backdoor

23

way to increase prices to its prospective and current television service subscribers, while

24

continuing to advertise and promise a lower "sticker price" for its service packages. Rather than

25

implementing a top-line price increase for its television service packages and bundles, Comcast

26

instead kept the advertised price the same and hid the price increase in a newly invented and

27

inadequately disclosed "Broadcast TV Fee." In reality, the Broadcast TV Fee was a bogus

28

double-charge for the broadcast television channels Comcast had promised were already included in the advertised package price.

110.    In January 2015, Comcast expanded this scheme by introducing the "Regional Sports Fee" in order to similarly disguise programming price increases for local sports channels. Similar to the Broadcast TV Fee, the Regional Sports Fee was a bogus double-charge for local sports channels which Comcast had promised were already included in the advertised "sticker price" for the package purchased by the customer.

111.    Comcast charges the Broadcast TV Fee to all Comcast cable television subscribers. Comcast charges the Regional Sports Fee to Comcast cable television subscribers with the Digital Starter Package or a higher level of service.

112.    Comcast perpetrates this massive bait-and-switch scheme in order to increase demand for its services and to increase its profits. Comcast tricks customers into thinking they will pay the lower advertised "sticker price," rather than the significantly higher price they will actually be charged. The Fees now add as much as $12.00 per month to customer bills, often accounting for more than 10% of the subscriber's total bill.

113.    Comcast's advertising (defined for purposes of this Complaint as all of Comcast's communications to or with current or potential customers) is likely to mislead or deceive an ordinary or reasonable consumer. Comcast's advertising is misleading or false because the price certain advertised for cable service packages is not the price actually charged; Comcast increases the price it actually charges by adding the Fees and then increasing the Fees in the middle of a supposedly fixed-rate contract.

114.    Additionally, Comcast perpetrates the deceptive practice as experienced by Plaintiff Robertson where Comcast increases the price above the promised rate for the service package by reducing, mid-contract, offsetting "Service Discount(s)" which were initially applied on the first bill(s) to achieve the promised rate (separate and apart from the excess charges for the Fees).

115.    Consumers are paying a premium for a falsely advertised product or service. The general public has been, and continues to be, exposed to false information, which causes Comcast

1   to charge and receive higher prices than advertised. Many consumers would not purchase

2   Comcast's services, or agree to pay the price they will in fact be actually charged, but for the

3   misleading or deceptive advertising.

A.      **Comcast Engages in False and Misleading Advertising About the Prices It Charges for Its Cable Television Service Packages.**

116.    In its website advertising and online order process, Comcast *never* includes an asterisk or qualifier next to the prominently displayed price for its service packages which could put the consumer on notice that the sticker price does not include additional programming charges which are hidden in the form of the automatically billed Fees. E.g. see **Exhibits E-K**. On each page of the online order process, Comcast prominently displays the advertised price as the "Monthly Total," despite that total not including the cost of the Broadcast TV Fee and the Regional Sports Fee. *Id.*

117.    Comcast displays a prominent blue question mark next to the "Monthly Total" amount; when one hovers over the question mark, a text box appears stating:

> **This is the base monthly total of all recurring charges for the services you have selected**. It does not include tax or one-time charges (such as installation or Pay-Per-View fees) that may appear on individual bills.

See **Exhibit J**. But the stated "base monthly total" does not include the cost of the Broadcast TV Fee and the Regional Sports Fee, which are in fact recurring double-charges for ABC, NBC, CBS, FOX and local sports channels *which Comcast has already advertised and promised are included in the lower package price*. E.g., see the offer page screenshot taken by Mr. Adkins at **Exhibit E** (the $79.99 price is advertised as including "140 Channels" of TV and "24/7 Sports coverage on all major networks," despite the $79.99 price not including the additional $8.00 – a 10% increase – for the automatically charged Broadcast TV Fee and Regional Sports Fee to provide that very same programming.

118.    Comcast makes the same misrepresentations and omissions in its other forms of advertising such as direct mail. As reflected in the advertising flyer mailed to Mr. Robertson, Comcast likewise never includes an asterisk or qualifier next to the prominently advertised price

for its service packages, and buries its unreferenced disclaimers in tiny fine print in a location consumers are unlikely to notice. See **Exhibit S**.

119.    Meanwhile, Comcast's hidden advertising disclaimers, in the event they are seen by consumers, are themselves misleading. The disclaimers are designed to falsely imply that the Fees are government-imposed charges. For example, buried in the fine print on page 2 of the flyers sent to Mr. Robertson is the following sentence: "Equipment, installation, *taxes and fees, including* regulatory recovery fees, Broadcast TV Fee (up to $3.50/mo.), Regional Sports Fee (up to $1.00/mo.) and other applicable charges extra …" (emphasis added). *Id.*

120.    A reasonable consumer would assume the phrase "*taxes and fees*" which explicitly "include[s]" the strange and undefined terms "Broadcast TV Fee" and "Regional Sports Fee," refers to taxes and government fees outside of Comcast's control.

121.    Comcast's representations on its website and in its advertising are false, because it charges more than it promises it will charge, via the deceptive Broadcast TV Fee and Regional Sports Fee.

**B.     Comcast's Sales Agents Make False and Misleading Statements About the Prices Comcast Charges for Its Cable Television Service Packages.**

122.    Comcast sales agents – including telesales agents, online chat agents, and in-store sales staff – universally do not disclose or mention the existence of the Broadcast TV Fee and the Regional Sports Fee to prospective customers. Further, when they quote customers the total order price, the agents falsely say that the stated price is the total price "*plus taxes*" or "*plus taxes and fees.*" A reasonable consumer would interpret the phrase "taxes and fees" to mean government or regulatory charges, as opposed to discretionary, double-charges for channels Comcast has already promised are included in the advertised package price.

123.    Mr. Robertson's experience with online and telephone agents was typical. An online chat agent promised him that there would be no extra charges above the advertised and promised $49.99 package price for 12 months except for taxes and government fees, and the agent did not mention the existence of the Broadcast TV Fee. See ¶ 69 *supra*. Similarly, in his later telephone call with a Comcast agent who "re-put the order in," the agent promised a $54.99

1   package price ($49.99 plus an additional $5 upgrade for faster Internet), and the agent made no

2   mention of the Broadcast TV Fee. See ¶¶ 72-74 *supra.*

3       124.   Other Comcast customers similarly placed their orders in reliance on statements by

4   Comcast sales agents that the quoted price was the total cost plus taxes or plus taxes and

5   government fees, but were not informed by the sales agents of the existence of the Broadcast TV

6   Fee and/or the Regional Sports Fee.

7       125.   For example, when John Bailey, a Comcast customer from Covington,

8   Washington, spoke with a Comcast telesales agent on July 23, 2016 to upgrade his Internet-only

9   plan to a Double Play plan with Internet plus television, the agent falsely promised him the total

10   price would be the advertised package price "plus taxes," and the agent did not mention the

11   additional $5.00 Broadcast TV Fee.[1]

12       126.   For example, when Comcast customer Robert Summey of Jacksonville, Florida

13   asked an online chat sales agent on November 25, 2016 what his total monthly bill would be, the

14   agent falsely promised him it would be $109.99 "plus taxes," and the agent did not mention the

15   additional $12.00 in the form of the Broadcast TV Fee and the Regional Sports Fee.

16       127.   For example, when Nola Palmer of Littleton, Colorado, specifically asked a

17   Comcast telesales agent in March 2016 what additional charges would be added to the bill above

18   the advertised price, the agent estimated taxes and falsely stated that the only additional charges

19   would be FCC-mandated fees.

20       128.   For example, when James McLaughlin of Aurora, Illinois signed up for Comcast

21   in person at a Comcast service center on March 24, 2016 and asked the agent behind the counter

22   what his total bill would be per month, the agent falsely stated the only additional charge above

23   the advertised package price would be taxes.

24       129.   Plaintiff Robertson's experience, and the experience of these other named Comcast

25   customers, are typical of the experiences of the general public, i.e. of Comcast prospective

26   customers and current customers.

27

28   _____
[1] Plaintiffs are in possession of the official Comcast audio recording of this call.

130.    Through the discovery process in this case, Plaintiffs will obtain further evidence showing that Comcast has a uniform, standard policy of directing and/or encouraging its sales agents to deceptively state that the advertised price plus equipment charges is the total monthly service price plus "taxes" or "taxes and fees," and/or that Comcast policy is for sales agents to not mention or disclose the existence of the Broadcast TV Fee or the Regional Sports Fee (which in many cases adds more than 10% to the cost of the bill).

C.    **Comcast Lies To Customers Who Enquire or Complain About the Broadcast TV Fee or the Regional Sports Fee By Telling Them the Charges Are Taxes or Government Fees.**

131.    When customers contact Comcast to ask or complain about the Fees, Comcast doubles down on its deception through its practice of lying to customers by saying that the Fees are taxes or government-imposed charges over which Comcast has no control.

132.    For example, when Plaintiff Robertson contacted a Comcast chat agent to complain about the Broadcast TV Fee, the agent told him the Broadcast TV Fee was a "Government approved charge implemented by Comcast to all cable subscribers."

133.    For example, Comcast customers have posted on Comcast's official online "Help & Support Forums" that they were told by Comcast agents that the Broadcast TV Fee and the Regional Sports Fee are taxes or government fees:

Posted on Comcast's Website on June 11, 2016:
I called comcast today to complain about the extra [Broadcast TV Fee and Regional Sports Fee] charges that are added to the bill. I was told that it was a tax. IT IS NOT A TAX, it is a fee charged by Comcast. They are charging us an extra $8 per month, without giving us any additional services. I believe we have a class action lawsuit waiting to happen.[2]

Posted on Comcast's Website on July 19, 2015:
Upon review of my Comcast bills I called today, Sunday, to find out why I was being charged for a $3 Broadcast TV fee and a $1 Regional Sports Fee. These charges appeared in my June and July bills under the section "Other Charges & Credits" and I wanted to get a better understanding of what and why these charges appeared all of a sudden and if they can be removed. As an aside, I don't watch sports. The call center agent explained they were state and government taxes and could not be removed. I asked her why they didn't appear in the "Taxes,

_____

[2] http://forums.xfinity.com/t5/Billing/Broadcast-TV-Fee/td-p/2671674

Surcharges, and Fees" section and she corrected herself and stated that they are not State fees but that they are government fees that Comcast had been approved to charge customers.[3]

134.    For example, when Comcast customer Jonathan Bailey of Covington, Washington, spoke to a "customer loyalty department" telephone agent on August 23, 2016 and demanded that Comcast remove the previously undisclosed $5.00 Broadcast TV Fee from his bill, the agent responded, "There's no way we can remove the fee, it's from the state." When Mr. Bailey asked the agent to give him a $5.00 monthly credit instead, the agent refused, stating, "Well, we can't credit you $5.00 a month for a fee that is a state tax."[4]

135.    The experiences of Plaintiff Robertson, and the experiences of these other named Comcast customers, are typical and representative of Comcast's general practices. Through the discovery process in this case, Plaintiffs will obtain further evidence showing that Comcast has a policy of encouraging and/or condoning its customer service agents to lie to customers who complain about the Fees by telling them the Fees are taxes or government fees.

**D.    <u>Comcast's Form Contracts Do Not Adequately Disclose the Broadcast TV Fee or the Regional Sports Fee.</u>**

136.    Comcast's form Subscriber Agreement does not mention the Broadcast TV Fee or Regional Sports Fee anywhere in its 23 pages of small type.

137.    Section 2(a) of the Subscriber Agreement, which concerns the "Charges, Fees, and Taxes You Must Pay," is larded from top to bottom with references to government-imposed taxes, fees, and programs, and implies that all additional monthly non-equipment fees are government-related:

> **Charges, Fees, and Taxes You Must Pay.** You agree to pay all charges associated with the Service(s), including, but not limited to, installation/service call charges, monthly service charges, XFINITY Equipment (as defined below) charges, measured and per call charges, applicable federal, state, and local taxes and fees (however designated), regulatory recovery fees for municipal, state and federal government fees or assessments imposed on Comcast, permitted fees and cost recovery charges, or any programs in which Comcast participates, including, but not limited to, public, educational, and governmental access, universal service,

---

[3] http://forums.xfinity.com/t5/Billing/broadcast-tv-fee/td-p/2457405

[4] Plaintiffs are in possession of the official Comcast audio recording of this call.

telecom relay services for the visually/hearing impaired, rights-of-way access, and programs supporting the 911/E911 system and any fees or payment obligations imposed by governmental or quasi-governmental bodies for the sale, installation, use, or provision of the Service(s). YOU WILL BE RESPONSIBLE FOR PAYING ANY GOVERNMENT IMPOSED FEES AND TAXES THAT BECOME APPLICABLE RETROACTIVELY. We will provide you with notice and an effective date of any change in our prices or fees, unless the change in price is related to a change in governmental or quasi-governmental taxes, fees, or assessments, in which case we may elect not to provide notice except where required by applicable law. Not all fees apply to all Service(s).

**Exhibit A**, Section 2(a).

138.     Comcast's separate Minimum Term Agreement document also does not adequately disclose the Fees. Meanwhile, in many cases – such as in the cases of both Plaintiffs – Comcast does not email or mail the Minimum Term Agreement to the customer and does not get customer consent to its terms. See ¶¶ 46-47 (Adkins), ¶¶ 84-85 (Robertson), *supra*.

139.     In bold, boxed text at the top of the Minimum Term Agreement, Comcast prominently displays the guaranteed monthly price for the contract term, *with no asterisk or qualifier*. E.g., see the Minimum Term Agreement for Mr. Adkins at **Exhibit P**.

140.     Comcast only mentions the Broadcast TV Fee and the Regional Sports Fee in a single disclaimer sentence in the Minimum Term Agreement which states that they are part of "taxes and fees":

Equipment, installation, **taxes and fees, including** Broadcast TV Fee (currently up to $5.00/mo.), Regional Sports Fee (currently up to $3.00/mo.) and if XFINITY Digital Voice is included, regulatory recovery fees and other applicable charges (e.g. per-call or international charges) are extra, such charges and fees are subject to change during and after the term of this Agreement.

*Id.* (emphasis added).

141.     A reasonable consumer would interpret the phrase "taxes and fees" to mean non-discretionary government charges, as opposed to discretionary, double-charges for channels Comcast has already promised are included in the advertised package price.

**E.     Comcast Falsely Advertises Guaranteed, Locked-In Prices for Its Term Contracts, When Comcast In Fact Repeatedly Raises Its Prices Mid-Contract Via Increases in the Broadcast TV Fee and the Regional Sports Fee.**

142.     Comcast has induced millions of consumers to enter into one-year or two-year

service contracts by promising them a "locked-in" and "guaranteed" low promotional rate which will not increase during the term of the contract. Pursuant to their contracts with Comcast, the customers cannot terminate their minimum term service agreement without paying a significant early "termination fee." For example, the Minimum Term Agreement purportedly assigned to Plaintiff Adkins specifies a $230.00 termination fee, which is slowly reduced over time. See **Exhibit P** at ¶ 5.

143.    Yet contrary to Comcast's representations and advertising, and in breach of these promises, Comcast has a policy of increasing the Broadcast TV Fee and the Regional Sports Fee in the middle of "guaranteed" fixed-rate customer contracts as a backdoor way to repeatedly raise its prices on these trapped customers.

144.    For example, in month 8 of Mr. Robertson's 12-month purportedly fixed-rate contract, Comcast raised his Broadcast TV Fee from $3.25 to $5.00. See ¶ 98 *supra*. For example, in month 9 of Mr. Adkins' 24-month purportedly fixed-rate contract, Comcast raised his charges for the Broadcast TV Fee from $5.00 to $7.00 and the Regional Sports Fee from $3.00 to $5.00. See ¶ 52.

145.    Comcast falsely advertises "guaranteed" lower fixed-rate pricing to induce customers to enter into long-term contracts, when in fact Comcast never honors these representations made to its customers.

F.    **Comcast's Bait-and-Switch Scheme Is Central to Its Marketing Plan and Accounts for an Increasingly Large Part of Comcast's Total Revenues and Profits.**

146.    Comcast perpetrates this massive bait-and-switch scheme in order to increase demand for its services and to increase its profits. Comcast hooks and traps customers like Plaintiffs into one-year or two-year contracts, with the intent of charging them more than promised and then, to add insult to injury, Comcast soon further raises the price *even higher* in the middle of the promised fixed-rate term via increases in the Fees.

147.    Comcast has increased the Fees by 800% since they were first introduced in 2014.

148.    Comcast will continue its false advertising and fraudulent representations to the general public regarding the Fees until it is forced by law to stop. The scheme is far too profitable. Plaintiffs estimate that Comcast earns approximately $2 billion per year from these sham double-charges – over $200 million annually from its California customers alone.

## VII.    CHOICE OF LAW

149.    The law of California applies.

## CAUSES OF ACTION
### COUNT I
### Breach of Contract

150.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 149, inclusive, as though alleged in this Count.

151.    Comcast entered into valid contractual agreements with Plaintiffs.

152.    The essential terms of Comcast's contracts with Plaintiffs included that the promised and quoted price for their service was the actual price they would pay except for equipment charges and bona fide taxes and government-related fees.

153.    The essential terms of Comcast's contracts with Plaintiffs included that the promised and quoted price for service included all of Comcast's discretionary charges for the channels that Comcast promised and advertised were already included in the advertised package price (e.g. ABC, CBS, NBC, FOX, and local sports channels).

154.    Comcast has breached its contracts with Plaintiffs by charging a higher amount for its service than it promised them it would charge, by double-charging for the broadcast television and local sports channels in the form of the deceptive and inadequately disclosed Broadcast TV Fee and Regional Sports Fee, and by failing to keep its promise of including all discretionary charges for those channels in the promised and quoted monthly price.

155.    Comcast has breached its contract with Plaintiff Robertson by increasing the price above the promised base rate by reducing, mid-contract, an offsetting "Service Discount" which was initially applied on Mr. Robertson's first bills to achieve the promised base rate (separate and apart from the excess charges for the Fees). See ¶ 100. (Although Plaintiff Robertson was

1  damaged by this breach concerning the disappearing "Service Discount," Mr. Robertson is not

2  seeking damages based on this breach.)

3       156.    Comcast has breached its contract with Plaintiff Adkins by failing to include the

4  promised Blast Pro Internet (i.e. faster Internet speeds) in his service package. See ¶ 51.

5  (Although Plaintiff Adkins was damaged by this breach concerning Comcast's failure to provide

6  Blast Pro Internet, Mr. Adkins is not seeking damages based on this breach.)

7       157.    The essential terms of Comcast's contracts with Plaintiffs included Comcast's

8  obligation to provide services at the monthly promised rate for the contract's duration, and to not

9  increase its discretionary charges during the duration of the contract. Plaintiffs agreed to commit

10  themselves to long-term contracts with early termination penalties in reliance on Comcast's

11  promise of a guaranteed and fixed lower price for service during the term of the contract.

12       158.    Comcast has breached its contracts with Plaintiffs by increasing its prices in the

13  middle of their promised fixed-rate contracts via increases in the Broadcast TV Fee and/or the

14  Regional Sports Fee, and by failing to keep its discretionary charges constant during the contract

15  term.

16       159.    Plaintiffs gave consideration that was fair and reasonable, and have performed all

17  conditions, covenants, and promises required to be performed under their contracts with Comcast.

18       160.    Comcast's breaches of its contracts with Plaintiffs have caused Plaintiffs to suffer

19  damages, and have caused Mr. Adkins to continue to suffer damages on an ongoing basis, in an

20  amount to be proven at trial.

21  **<u>COUNT II</u>**
**<u>Intentional Misrepresentation</u>**

22

23       161.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 149, inclusive,

as though alleged in this Count.

24

25       162.    Comcast's misrepresentations, non-disclosures, and omissions alleged herein were

made with an intent to defraud and to induce reliance by Plaintiffs.

26

27       163.    Comcast intentionally misled Plaintiffs to believe it would charge them an

advertised and promised flat monthly rate for television programming, while intending to charge

28

a much higher rate via an inadequately disclosed and deceptive Broadcast TV Fee and Regional Sports Fee.

164.    Comcast intentionally misled Plaintiffs by promising them that the charges for the broadcast television and local sports channels were included in the advertised price, when Comcast in fact intended to double-charge them for the broadcast television and local sports channels in the form of the Fees.

165.    Comcast intentionally misled Plaintiffs by inducing them into signing long-term contracts with stiff early termination penalties by promising a lower fixed monthly rate, while in fact intending to increase their monthly rate mid-contract within a few months via increases in the Fees.

166.    Comcast intentionally misled Plaintiff Robertson by promising a flat rate, while in fact intending to increase the price above that rate by reducing, mid-contract, an offsetting "Service Discount" which was initially applied on Mr. Robertson's first bills to achieve the promised rate (separate and apart from the excess charges for the Fees). (Although Plaintiff Robertson was damaged by this intentional misrepresentation concerning the disappearing "Service Discount," Mr. Robertson is not seeking damages based on this misrepresentation.)

167.    Comcast intentionally misled Plaintiff Adkins by advertising and promising that Blast Pro Internet (i.e. faster Internet speeds) was included in his service package, when in fact Comcast did not intend to actually provide Blast Pro Internet with his service package at the promised price. (Although Plaintiff Adkins was damaged by this intentional misrepresentation concerning the Blast Pro Internet, Mr. Adkins is not seeking damages based on this misrepresentation.)

168.    Comcast intentionally deceived Plaintiffs by omitting, hiding and/or disguising said Fees in its advertising and customer agreements, and by falsely implying and/or stating that the Fees were government-related charges.

169.    Plaintiffs reasonably and justifiably relied upon Comcast's material misrepresentations, non-disclosures, and omissions in purchasing their service contracts.

170.    As a result of the foregoing, Plaintiffs have been injured and have lost money or

1  property.

2                                  **COUNT III**
                     **Violations of California's Unfair Competition Law**
3             **California Business & Professions Code § 17200 et seq.**

4         171.   Plaintiffs reallege and incorporate by reference Paragraphs 1 through 149,

5  inclusive, as though alleged in this Count.

6         172.   Comcast's practices, misrepresentations, and omissions alleged herein constitute

7  unlawful, unfair, or fraudulent business practices in violation of California Business and

8  Professions Code § 17200 et seq.

9         173.   The misrepresentations and omissions by Comcast alleged herein were the type of

10  misrepresentations and omissions that are regularly considered to be material, i.e., a reasonable

11  person would attach importance to them and would be induced to act on the information in

12  making purchase decisions.

13         174.   Plaintiffs reasonably relied upon Comcast's material misrepresentations and

14  omissions in purchasing their cable service packages.

15         175.   As a result of the foregoing, Plaintiffs have been injured and have lost money or

16  property.

17         176.   As a result of the foregoing, Plaintiffs are entitled to restitution based on

18  Comcast's misrepresentations and omissions concerning the Fees. (Although Plaintiff Adkins was

19  damaged, and continues to be damaged each month, by the misrepresentation concerning Blast

20  Pro Internet speeds being included in his service package, Mr. Adkins is not seeking restitution

21  based on this misrepresentation; although Plaintiff Robertson was damaged by the

22  misrepresentation concerning the disappearing "Service Discount," Mr. Robertson is not seeking

23  restitution based on this misrepresentation. However, Mr. Adkins and Mr. Robertson are seeking

24  injunctive relief on behalf of the general public to prohibit these practices.)

25         177.   As a result of the foregoing, Plaintiff Adkins continues to be harmed on an

26  ongoing basis by being charged the Fees, and by being subject to Comcast's unilateral,

27  unknowable future increases in the Fees despite his being in the middle of a purportedly fixed-

28  rate contract.

178.     As a result of the foregoing, both Plaintiffs Adkins and Robertson continue to be harmed on an ongoing basis because they face the threat of actual and/or imminent harm by not being able to rely with any confidence upon the truthfulness of Comcast's future advertising. Comcast's false advertising threatens to invade Plaintiffs' statutory right under California's Unfair Competition Law to receive truthful information from Comcast about its services. Plaintiffs should not be put to the task of sorting out which of Comcast's future representations regarding the prices of its cable service packages are truthful and which are misleading, deceptive or false; California law relieves them of that burden.

179.     Unless restrained by this Court, Comcast will continue to engage in unfair, deceptive, and unlawful conduct, as alleged above, in violation of California Business and Professions Code § 17200 *et. seq.*, harming Plaintiffs and the general public.

180.     As a result of the foregoing, Plaintiffs and the general public are entitled to injunctive relief.

181.     The balance of the equities favors the entry of permanent injunctive relief against Comcast. The general public will be irreparably harmed absent the entry of permanent injunctive relief against Comcast. The general public lacks an adequate remedy at law. A permanent injunction against Comcast is in the public interest. Comcast's unlawful behavior is likely to reoccur absent the entry of a permanent injunction.

182.     Plaintiffs seek permanent injunctive relief in the form of a Judgment and Permanent Injunction containing the prohibitions and mandates pled hereinbelow, including in the Prayer, or as the Court otherwise deems just and proper.

### COUNT IV
### Violations of California Business & Professions Code § 17500 *et seq.* ("FAL")

183.     Plaintiffs reallege and incorporate by reference Paragraphs 1 through 149, inclusive, as though alleged in this Count.

184.     Comcast has committed acts of untrue and misleading advertising, as defined by California Business and Professions Code § 17500 ("False Advertising Law" or "FAL"), by engaging in the acts and practices described herein with the intent and/or the effect of inducing

1    consumers to purchase its cable service packages.

2         185.    Comcast falsely advertised to Plaintiffs and the general public that it would charge

3    them a fixed monthly rate for television service packages, when in fact Comcast intended to

4    charge them and/or did charge them a much higher rate via an inadequately disclosed and

5    deceptive Broadcast TV Fee and Regional Sports Fee. By this means (and as elsewhere pled

6    herein), Comcast has engaged in false advertising by disseminating or causing to be made or

7    disseminated any such statement as part of a plan or scheme with the intent not to sell those

8    services, professional or otherwise, so advertised at the price stated therein, or as so advertised.

9         186.    Comcast falsely advertised to Plaintiffs and the general public that the charges for

10   the broadcast television and local sports channels were included in the advertised price, when in

11   fact Comcast intended to double-charge them and/or did double-charge them for the broadcast

12   television and local sports channels in the form of the Fees.

13        187.    Comcast falsely advertised to Plaintiffs and the general public that the long-term

14   contracts it advertised were at a fixed and/or guaranteed monthly rate, when in fact Comcast

15   intended to and did increase the monthly rate mid-contract via increases in the Fees.

16        188.    Comcast deceived Plaintiffs and the general public by omitting, hiding and/or

17   disguising said Fees in its statements to Plaintiffs and consumers and in its advertising and

18   customer agreements, and by falsely implying and/or stating that the Fees were non-discretionary

19   government charges or taxes.

20        189.    Comcast's misrepresentations and omissions deceive or have a tendency to

21   deceive the general public.

22        190.    The misrepresentations and omissions by Comcast alleged herein were the type of

23   representations and omissions that are regularly considered to be material, i.e., a reasonable

24   person would attach importance to them and would be induced to act on the information in

25   making purchase decisions.

26        191.    Plaintiffs reasonably relied on Comcast's false advertising in purchasing their

27   cable service packages.

28        192.    As a result of the foregoing, Plaintiffs have been injured and have lost money or

1    property.

2         193.    As a result of the foregoing, Plaintiffs are entitled to restitution based on

3    Comcast's false advertising and misrepresentations concerning the Fees. (Although Plaintiff

4    Adkins was damaged, and continues to be damaged each month, by the misrepresentation

5    concerning Blast Pro Internet speeds being included in his service package, Mr. Adkins is not

6    seeking restitution based on this misrepresentation; although Plaintiff Robertson was damaged by

7    the misrepresentation concerning the disappearing "Service Discount," Mr. Robertson is not

8    seeking restitution based on this misrepresentation. However, Mr. Adkins and Mr. Robertson are

9    seeking injunctive relief on behalf of the general public to prohibit these practices.)

10        194.    As a result of the foregoing, Plaintiff Adkins continues to be harmed on an

11   ongoing basis by being charged the Fees, and by being subject to Comcast's unilateral,

12   unknowable future increases in the Fees despite his being in the middle of a purportedly fixed-

13   rate contract.

14        195.    As a result of the foregoing, both Plaintiffs Adkins and Robertson continue to be

15   harmed on an ongoing basis because they face the threat of actual and/or imminent harm by not

16   being able to rely with any confidence upon the truthfulness of Comcast's future advertising.

17   Comcast's false advertising threatens to invade Plaintiffs' statutory right under California's False

18   Advertising Law to receive truthful information from Comcast about its services. Plaintiffs should

19   not be put to the task of sorting out which of Comcast's future representations regarding the

20   prices of its cable service packages are truthful and which are misleading, deceptive or false;

21   California law relieves them of that burden.

22        196.    Unless restrained by this Court, Comcast will continue to engage in unfair,

23   deceptive, and unlawful conduct, as alleged above, in violation of California Business and

24   Professions Code § 17500 *et. seq.*, harming Plaintiffs and the general public.

25        197.    As a result of the foregoing, Plaintiffs and the general public are entitled to

26   injunctive relief.

27        198.    The balance of the equities favors the entry of permanent injunctive relief against

28   Comcast. The general public will be irreparably harmed absent the entry of permanent injunctive

- 34 -

1    relief against Comcast. The general public lacks an adequate remedy at law. A permanent

2    injunction against Comcast is in the public interest. Comcast's unlawful behavior is likely to

3    reoccur absent the entry of a permanent injunction.

4        199.    Plaintiffs seek permanent injunctive relief in the form of a Judgment and

5    Permanent Injunction containing the prohibitions and mandates pled hereinbelow, including in

6    the Prayer, or as the Court otherwise deems just and proper.

7                                    **COUNT V**
                  **Violations of California's Consumers Legal Remedies Act ("CLRA")**
8                          **California Civil Code § 1750 *et seq.***

9        200.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 149,

10   inclusive, as though alleged in this Count.

11       201.    Comcast is a "person," as defined by California Civil Code § 1761(c).

12       202.    Plaintiffs are "consumers," as defined by California Civil Code § 1761(d).

13       203.    The cable service plans marketed and sold by Comcast constitute "goods" and

14   "services" as defined by California Civil Code § 1761(a) and (b).

15       204.    Plaintiffs' purchases of Comcast's services constitute "transactions," as defined by

16   California Civil Code § 1761(e).

17       205.    Venue is proper under California Civil Code § 1780(d) because a substantial

18   portion of the transactions at issue occurred in this county. Plaintiffs' declarations establishing

19   that this Court has proper venue for this action are attached hereto as **Exhibit Y**.

20       206.    Comcast misled Plaintiffs and the general public to believe it would charge them

21   an advertised and promised fixed monthly rate for television programming, but in fact Comcast

22   charged a much higher rate via the inadequately disclosed and deceptive Broadcast TV Fee and

23   Regional Sports Fee.

24       207.    Comcast misled, and continues to mislead, Plaintiffs and the general public by

25   promising them that the charges for the broadcast TV and local sports channels are included in

26   the advertised and stated price, when Comcast in fact intended to, and did, double-charge them

27   for the broadcast television and local sports channels in the form of the Fees.

28       208.    Comcast misled, and continues to mislead, Plaintiffs and the general public by

inducing them into signing long-term contracts with stiff early termination penalties by promising a lower fixed monthly rate, while in fact intending to increase their monthly rate mid-contract within a few months via increases in the Fees.

209. Comcast misled, and continues to mislead, Plaintiffs and the general public by promising them that the charges for the broadcast television and local sports channels are included in the advertised and stated price, when Comcast in fact intended to double-charge them and did double-charge them for the broadcast television and local sports channels in the form of the Fees.

210. Comcast misled, and continues to mislead, Plaintiffs and the general public by inducing them into signing long-term contracts by promising a lower fixed monthly rate, while in fact intending to increase and in fact increasing their monthly rate mid-contract via increases in the Fees.

211. Comcast deceived, and continues to deceive, Plaintiffs and the general public by omitting, hiding and/or disguising said Fees in its statements to Plaintiffs and consumers and in its advertising and customer agreements, and by falsely implying or stating that the Fees are non-discretionary government charges or taxes.

212. Comcast deceived Plaintiff Robertson and the general public by promising a flat package rate, while in fact intending to increase the price above that rate by reducing, mid-contract, offsetting "Service Discount(s)" which are initially applied on the first bills to achieve the promised rate (separate and apart from the excess charges for the Fees).

213. Comcast intentionally deceived Plaintiff Adkins by advertising and promising that Blast Pro Internet (i.e. faster Internet speeds) was included in his service package, when in fact Comcast did not intend to actually provide Blast Pro Internet with his service package at the promised price.

214. Comcast's misrepresentations, active concealment, and failures to disclose violated, and continue to violate, the CLRA in ways including, but not limited to, the following:

      a.     Comcast misrepresented that its service plans had characteristics, benefits, or uses that they did not have (Cal. Civ. Code § 1770(a)(5));

1      b.     Comcast advertised its services with an intent not to sell them as advertised

2  (Cal. Civ. Code § 1770(a)(9));

3      c.     Comcast made false or misleading statements of fact concerning reasons

4  for, existence of, or amounts of price reductions (Cal. Civ. Code § 1770(a)(13));

5      d.     Comcast misrepresented that its service plans conferred rights, remedies or

6  obligations that they did not have (Cal. Civ. Code § 1770(a)(14));

7      e.     Comcast misrepresented that its service plans were supplied in accordance

8  with previous representations when they were not (Cal. Civ. Code § 1770(a)(16)); and

9      f.     Comcast inserted unconscionable provisions in its customer contracts (Cal.

10  Civ. Code § 1770(a)(19)).

11     215.   Comcast's misrepresentations and nondisclosures regarding its service plans were

12  material to Plaintiffs because Plaintiffs considered, and a reasonable person would have

13  considered, them important in deciding whether to purchase Comcast's service plans, and because

14  Comcast had a duty to disclose the truth.

15     216.   Plaintiffs reasonably relied upon Comcast's material misrepresentations and

16  nondisclosures, and had they known the truth, they would have acted differently.

17     217.   As a direct and proximate result of Comcast's material misrepresentations and

18  nondisclosures, Plaintiffs have suffered monetary damages and been irreparably harmed.

19     218.   As a result of the foregoing, Plaintiffs are entitled to damages based on Comcast's

20  material misrepresentations and nondisclosures concerning the Fees. (Although Plaintiff Adkins

21  was damaged, and continues to be damaged each month, by the misrepresentation concerning

22  Blast Pro Internet speeds being included in his service package, Mr. Adkins is not seeking

23  damages based on this misrepresentation; although Plaintiff Robertson was damaged by the

24  misrepresentation concerning the disappearing "Service Discount," Mr. Robertson is not seeking

25  damages based on this misrepresentation. However, Mr. Adkins and Mr. Robertson are seeking

26  injunctive relief on behalf of the general public to prohibit these practices.)

27     219.   As a result of the foregoing, Plaintiff Adkins continues to be harmed on an

28  ongoing basis by being charged the Fees, and by being subject to Comcast's unilateral,

unknowable future increases in the Fees despite his being in the middle of a purportedly fixed-rate contract.

220.    As a result of the foregoing, both Plaintiffs Adkins and Robertson continue to be harmed on an ongoing basis because they face the threat of actual and/or imminent harm by not being able to rely with any confidence upon the truthfulness of Comcast's future advertising. Comcast's false advertising threatens to invade Plaintiffs' statutory right under California's Consumers Legal Remedies Act to receive truthful information from Comcast about its services. Plaintiffs should not be put to the task of sorting out which of Comcast's future representations regarding the prices of its cable service packages are truthful and which are misleading, deceptive or false; California law relieves them of that burden.

221.    Unless restrained by this Court, Comcast will continue to engage in unfair, deceptive, and unlawful conduct, as alleged above, in violation of California Civil Code § 1750 *et seq.*, harming Plaintiffs and the general public.

222.    As a result of the foregoing, Plaintiffs and the general public are entitled to injunctive relief.

223.    The balance of the equities favors the entry of permanent injunctive relief against Comcast. The general public will be irreparably harmed absent the entry of permanent injunctive relief against Comcast. The general public lacks an adequate remedy at law. A permanent injunction against Comcast is in the public interest. Comcast's unlawful behavior is likely to reoccur absent the entry of a permanent injunction.

224.    Plaintiffs seek permanent injunctive relief in the form of a Judgment and Permanent Injunction containing the prohibitions and mandates pled hereinbelow, including in the Prayer, or as the Court otherwise deems just and proper.

225.    In accordance with California Civil Code §1782(a), on December 24, 2015, Plaintiffs' counsel served Comcast with notice of its CLRA violations on behalf of Plaintiff Christopher Robertson by certified mail, return receipt requested. See **Exhibit U**. Comcast Senior Vice President Thomas R. Nathan responded to the CLRA notice demand letter in a letter to Plaintiffs' counsel dated February 25, 2016 in which Comcast denied liability and refused to

1    provide any of the requested relief whatsoever. See **Exhibit C**.

2        226.    On October 8, 2016, Plaintiffs' counsel emailed to Comcast paralegal Claudia

3    Salcedo a CLRA notice demand letter on behalf of Plaintiff Adkins addressed to Mr. Nathan. See

4    **Exhibit Q**. Ms. Salcedo acknowledged receipt of the notice in a reply email on October 10, 2016.

5    See **Exhibit Z**.

6        227.    Comcast did not respond to the second CLRA notice letter except to acknowledge

7    its receipt.

8        228.    Comcast has failed to provide appropriate relief for its CLRA violations within 30

9    days of its receipt of Plaintiffs' demand notices. Accordingly, pursuant to Cal. Civ. Code §§1780

10   and 1782(b), Plaintiffs Christopher Robertson and Dan Adkins are entitled to recover actual

11   damages, punitive damages, attorneys' fees and costs, and any other relief the Court deems

12   proper.

13                                    **<u>COUNT VI</u>**
                              **Permanent Public Injunctive Relief**
14                                   **(All Authority)**

15       229.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 149,

16   inclusive, as though alleged in this Count.

17       230.    The misrepresentations and omissions by Comcast alleged herein were the type of

18   misrepresentations and omissions that are regularly considered to be material, i.e., a reasonable

19   person would attach importance to them and would be induced to act on the information in

20   making purchase decisions.

21       231.    Plaintiffs reasonably relied upon Comcast's material misrepresentations and

22   omissions in purchasing their cable service packages.

23       232.    As a result of the foregoing, Plaintiffs have been injured and have lost money or

24   property.

25       233.    As a result of the foregoing, Plaintiff Adkins continues to be harmed on an

26   ongoing basis by being charged the Fees, and by being subject to Comcast's unilateral,

27   unknowable future increases in the Fees despite his being in the middle of a purportedly fixed-

28

1    rate contract.

2          234.    As a result of the foregoing, both Plaintiffs Adkins and Robertson continue to be

3    harmed on an ongoing basis because they face the threat of actual and/or imminent harm by not

4    being able to rely with any confidence upon the truthfulness of Comcast's future advertising.

5    Comcast's false advertising threatens to invade Plaintiffs' legal rights, under, but not limited to,

6    California's Unfair Competition Law, False Advertising Law, and Consumers Legal Remedies

7    Act to receive truthful information from Comcast about its services. Plaintiffs should not be put to

8    the task of sorting out which of Comcast's future representations regarding the prices of its cable

9    service packages are truthful and which are misleading, deceptive or false; California law relieves

10   them of that burden.

11         235.    Unless restrained by this Court, Comcast will continue to engage in unfair,

12   deceptive, and unlawful conduct, as alleged above, in violation of California law, harming

13   Plaintiffs and the general public.

14         236.    As a result of the foregoing, Plaintiffs and the general public are entitled to

15   injunctive relief.

16         237.    The balance of the equities favors the entry of permanent injunctive relief against

17   Comcast. The general public will be irreparably harmed absent the entry of permanent injunctive

18   relief against Comcast. The general public lacks an adequate remedy at law. A permanent

19   injunction against Comcast is in the public interest. Comcast's unlawful behavior is likely to

20   reoccur absent the entry of a permanent injunction.

21         238.    Plaintiffs seek permanent injunctive relief in the form of a Judgment and

22   Permanent Injunction containing the prohibitions and mandates pled hereinbelow, including in

23   the Prayer, or as the Court otherwise deems just and proper.

24

25

26

27

28

FIFTH AMENDED COMPLAINT
CASE NO. 3:16-CV-05969-VC

**PRAYER FOR RELIEF**

Plaintiffs request that the Court order relief and enter judgment against Defendant Comcast Corporation and Defendant Comcast Cable Communications, LLC (collectively, "Comcast"), jointly and severally or as otherwise appropriate, as follows:

1.      For damages, including actual damages, suffered by Plaintiffs Adkins and Robertson as a result of being charged the Fees;

2.      For restitution of all profits and unjust enrichment that Comcast obtained from Plaintiffs Adkins and Robertson as a result of its charging them the Fees;

3.      For punitive and exemplary damages as to Plaintiffs Adkins and Robertson as a result of Comcast's charging them the Fees;

4.      For pre-judgment and post-judgment interest;

5.      For public injunctive relief, whereby Comcast and all of their parent corporations, subsidiaries, affiliates, successors, assigns and the like, are each immediately, permanently and finally enjoined and restrained from doing any of the following:

(a)      Failing to include the total dollar amount of the combined Broadcast TV Fee and Regional Sports Fee in all prices in all advertisements (as broadly defined for purposes of the Judgment) which contain a price for services on which the Broadcast TV Fee or the Regional Sports Fee is levied (e.g., a $79.00/month service package on which Comcast levies an additional $12.00 in the form of the combined Broadcast TV Fee and Regional Sports Fee must be advertised in all advertisements as costing the consumer $91.00/month, with no other dollar amount to appear or be used in the advertisement as the cost to the consumer of said services);

(b)      Failing to clearly and conspicuously disclose to the consumer, before the consumer enters into a contract with Comcast and at all times thereafter when Comcast mentions the Broadcast TV Fee and/or the Regional Sports Fee, that the Broadcast TV Fee and the Regional Sports Fee are created and imposed by Comcast and are not government taxes or government fees;

(c)      Listing, for purposes of advertising or billing or for any other purpose, the Broadcast TV Fee or the Regional Sports Fee in or under a section, clause, or phrase labeled or

1 │ described as "taxes," "taxes and fees," or the like;

2 │           (d)     Failing to list the Broadcast TV Fee or the Regional Sports Fee in a

3 │ separate section labeled "Discretionary Comcast Charges" in any order summary, any order

4 │ confirmation, or any customer bill;

5 │           (e)     Increasing the Broadcast TV Fee or the Regional Sports Fee during a time

6 │ certain if Comcast advertised or promised a price certain for services during that time certain;

7 │           (f)     Increasing the monthly price of the service package above the price certain

8 │ advertised or promised for the service package by reducing, mid-contract, offsetting "Service

9 │ Discount(s)" which were initially applied on the first bill(s) to achieve the promised price

10 │ (separate and apart from the excess charges for the Fees);

11 │           (g)     Advertising that Blast Pro Internet and/or higher speed Internet is included

12 │ in the advertised service package when in fact Comcast does not include Blast Pro Internet and/or

13 │ higher speed Internet in the service package; and/or

14 │           (h)     Whatever other permanent injunctive relief the Court deems just and

15 │ proper.

16 │     6.     That Comcast pay Plaintiffs' attorneys' fees to the extent allowed by law;

17 │     7.     That Comcast pay Plaintiffs' costs to the extent allowed by law;

18 │     8.     That the Court retain jurisdiction to police Comcast's compliance with the

19 │ permanent injunctive relief, and/or

20 │     9.     Such other relief as the Court deems just and proper including, without limitation,

21 │ temporary or preliminary injunctive relief.

22 │                                **JURY DEMAND**

23 │     Plaintiffs demand a trial by jury on all issues so triable.

24 │

25 │

26 │

27 │

28 │

1

Dated:  March 1, 2018                 Respectfully submitted,

2

3

                                       By: _____
                                              Daniel M. Hattis

4

                                       Daniel M. Hattis (SBN 232141)
5                                      HATTIS LAW PLLC
                                       P.O. Box 1645
6                                      Bellevue, WA 98009
                                       Telephone: (650) 980-1990
7                                      Facsimile: (425) 412-7171
                                       Email: dan@hattislaw.com
8

9                                      Jason Skaggs (SBN 202190)
                                       SKAGGS FAUCETTE LLP
10                                     530 Lytton Ave 2nd FL
                                       Palo Alto, CA 94301
11                                     Telephone: (650) 617-3226
                                       Email: jason@skaggsfaucette.com
12

13                                     Tony J. Tanke (SBN 74054)
                                       LAW OFFICES OF TONY J. TANKE
14                                     2050 Lyndell Terrace, Suite 240
                                       Davis, CA 95616
15                                     Telephone: (530) 758-4530
                                       Email: appeals@tankelaw.com
16

17                                     Attorneys for Plaintiffs

18

19

20

21

22

23

24

25

26

27

28